EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA GJ2020111968168 AND APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2705(B)<br><br><br>Twitter Account:  @NunesAlt | SC NO. 1:20-sc-03082<br><br>**Filed Under Seal** |

**TWITTER, INC.'S MOTION TO QUASH SUBPOENA AND VACATE NONDISCLOSURE ORDER AND MEMORANDUM IN SUPPORT**

**INTRODUCTION**

The government has issued a subpoena (the "Subpoena") for "[a]ll customer or subscriber account information" for the Twitter user @NunesAlt (the "Account") from October 1, 2020 to present. Under the First Amendment, the government cannot compel Twitter to produce information related to the Account unless it "can show a compelling interest in the sought-after material and a sufficient nexus between the subject matter of the investigation and the information it seek[s]." *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d 1, 4 (D.D.C. 2012) (internal quotation marks omitted). While Twitter does not have visibility into the purpose of the Subpoena, Twitter has serious concerns whether the government can meet this standard given the context in which it has received the Subpoena.

It appears to Twitter that the Subpoena may be related to Congressman Devin Nunes's repeated efforts to unmask individuals behind parody accounts critical of him. His efforts to suppress critical speech are as well-publicized as they are unsuccessful. He recently sued Twitter, attempting to hold it liable for speech by the parody Twitter accounts @DevinCow, @DevinNunesMom, @fireDevinNunes, and @DevinGrapes, and asking the court in that case to

order Twitter to disclose information identifying those accounts. Each of these accounts were engaged in anonymous political speech critical of Congressman Nunes. That suit was dismissed against Twitter in June 2020 because Twitter cannot be liable for information originating with a third-party user of its service, but it appears to still be an active lawsuit against the Twitter users @DevinCow and @DevinNunesMom. Shortly thereafter, Twitter received the Subpoena. Public Tweets posted by the Account indicate that it may be operated by the same user as @DevinNunesMom. Congressman Nunes's attorney also sought third-party discovery from Twitter to unmask the @DevinCow account in an entirely unrelated case.

Given Congressman Nunes's numerous attempts to unmask his anonymous critics on Twitter—described in detail herein—Twitter is concerned that this Subpoena is but another mechanism to attack its users' First Amendment rights. Recent litigation also alleges that Congressman Nunes may be using the government to unmask his critics. *See* Declaration of Hayden Schottlaender ("Schottlaender Decl."), Ex. D. Twitter respectfully asks the Court to determine whether the government has a "compelling interest" in obtaining the Account's basic subscriber information, or, on the other hand, is endeavoring to unmask someone merely for engaging in speech critical of Congressman Nunes. Indeed, "[t]he First Amendment limits the authority of the federal government to criminalize speech," *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d at 5, and in light of Congressman Nunes's repeated efforts to silence criticism against him, any complaint that gave rise to the Subpoena may be aimed at doing the same.

The Subpoena was also accompanied by a nondisclosure order, gagging Twitter from notifying the Account of the existence of the Subpoena (the "Gag Order"). The Court should vacate the Gag Order as inconsistent with the First Amendment. First, court orders that forbid speech are

"classic examples of prior restraints," *Alexander v. United States*, 509 U.S. 544, 550 (1993), and prior restraints on speech "are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). As such, the Gag Order must be reviewed under strict scrutiny and further a compelling government interest. The Gag Order fails to pass strict scrutiny because the government has no compelling interest in preventing the Twitter user from even knowing about a subpoena that may infringe on his or her First Amendment right to anonymously criticize a politician. *See, e.g.*, *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d at 4 n.6 (Twitter user's "intervention is plainly appropriate where [his] First Amendment rights are at issue.") (collecting cases).

Second, the adverse results listed in the Gag Order are not likely to ensue from any disclosure because Twitter is preserving responsive identifying information.

Because the Subpoena and Gag Order violate both Twitter's and its user's rights protected by the First Amendment, the Subpoena should be quashed, and the Gag Order vacated.

## FACTUAL BACKGROUND

Over the past two years, Congressman Nunes and his campaign committee have brought at least nine lawsuits—including in this district—against individuals, the media, and one research and intelligence firm for either their disagreement with his political actions and policies, publishing statements that Congressmen Nunes deemed critical of himself, or hosting critical statements with which Congressman Nunes disagreed.[1] In 2019 alone, Congressman Nunes or his campaign committee brought lawsuits against the following:

---

[1] *See, e.g.*, *Nunes v. Meredith*, No. 1:21-cv-00078 (E.D. Cal.); *Nunes v. WP Co. LLC*, No. 1:20-cv-01405 (E.D. Va.); *Nunes v. WP Co. LLC*, No. 1:20-cv-01403 (D.D.C.); *Nunes v. Cable News Network, Inc.*, No. 1:20-cv-03976 (S.D.N.Y.); *Nunes v. Lizza*, No. 5:19-cv-04064 (N.D. Iowa); *Nunes v. Fusion GPS*, No. 1:19-cv-01148 (E.D.Va.); *Nunes v. Twitter, Inc.*, No. CL19001715-00 (Va. Cir. Ct.); *Nunes v. The McClatchy Co.*, No. CL19000629-00 (Va. Cir. Ct.); *Devin Nunes Campaign Comm. v. Seeley*, No. 279766 (Cal. Super. Ct.).

(1) a farmer and three other people for allegedly conspiring to impede his 2018 reelection prospects by exercising their First Amendment rights to petition the California Secretary of State, so that Congressman Nunes not be allowed to call himself a "farmer" on the ballot;[2]

(2) a research firm and a Democratic non-profit group for allegedly attempting to interfere with his investigation into Russia's intervention in the 2016 presidential election by leaking the "Steele Dossier";[3]

(3) Twitter, a political consultant, and two parody accounts—@DevinCow and @DevinNunesMom—for either hosting speech or engaging in speech critical of Congressman Nunes;[4]

(4) The McClatchy Company for stating that Congressman Nunes had a financial interest in a winery that one of its employees had sued for being asked to work during a yacht sex party;[5] and

(5) Hearst Magazines, Inc. and a journalist who published an article stating that Congressman Nunes's family dairy farm in Iowa is "[h]iding a [p]olitically [e]xplosive [s]ecret"—that it hires undocumented workers.[6]

Most of these lawsuits were either withdrawn by Congressman Nunes or dismissed on the grounds that (1) the speech at issue was either opinion, true, did not concern Congressman Nunes, or protected by the First Amendment, or (2) the complaint made conclusory allegations that were too

---

[2] *Devin Nunes Campaign Comm. v. Seeley*, No. 279766 (Cal. Super. Ct.).

[3] *Nunes v. Fusion GPS*, No. 1:19-cv-01148 (E.D.Va.).

[4] *Nunes v. Twitter, Inc.*, No. CL9-1715 (Va. Cir. Ct.).

[5] *Nunes v. The McClatchy Co.*, No. CL19000629-00 (Va. Cir. Ct.).

[6] *Nunes v. Lizza*, No. 5:19-cv-04064 (N.D. Iowa).

vague to state a claim.[7] In each of these cases, Congressman Nunes sought damages for what he believes were targeted attacks against his reputation, by being called names such as a "treasonous cowpoke" on Twitter,[8] and sought to unmask anonymous commenters critical of his job as a politician.

In his lawsuit against Twitter, Congressman Nunes served discovery requests to Twitter requesting the unmasking of several accounts critical of him. *See* Schottlaender Decl. ¶ 5, Ex. E. However, Congressmen Nunes's claims against Twitter were dismissed before Twitter had to comply with these discovery requests. *See* Schottlaender Decl. ¶ 5, Ex. F.

But his efforts to silence his critics have not stopped with his own lawsuits. Even in cases in which Congressman Nunes is not directly involved, his attorney has sought to unmask anonymous Twitter users critical of Congressman Nunes. In one such case, the plaintiff's attorney—who also represents Congressman Nunes in several lawsuits against the Congressman's critics—issued a third-party subpoena to Twitter seeking identifying information for 16 Twitter accounts, including @DevinCow, when the account @DevinCow appeared to have no relation to the underlying litigation.[9] *See Fitzgibbon v. Radack*, No. 3:19-cv-00477-REP (E.D. Va); *In Re Subpoena to Twitter, Inc.*, No. 3:20-mc-00005 (E.D. Va).

Indeed, the user at issue here appears to have been a party to one of Congressman Nunes's many superfluous lawsuits. On March 18, 2019, Congressman Nunes brought litigation against several Twitter users, including @DevinNunesMom, for defamation and other claims. *See*

---

[7] Congressman Nunes withdrew *Devin Nunes Campaign Comm. v. Seeley*, No. 279766 (Cal. Super. Ct.) and *Nunes v. The McClatchy Co.*, No. CL19000629-00 (Va. Cir. Ct.). In the remaining cases, the applicable courts granted motions to dismiss. *See, e.g.*, Order, *Nunes v. Lizza*, No. 5:19-cv-04064 (N.D. Iowa Aug. 4, 2020); Order, *Nunes v. Twitter, Inc.*, No. CL9-1715 (Va. Cir. Ct. July 24, 2020); Order, *Nunes v. Fusion GPS*, 1:19-cv-01148 (E.D. Va. Feb. 21, 2020).
[8] *See* Schottlaender Decl. ¶ 4, Ex. C, ¶¶ 9–10.
[9] Twitter did not produce any records in response to the subpoena. Before the court could rule on its motion to quash, the plaintiff withdrew the subpoena because the parties had reached a settlement. *See In Re Subpoena to re Twitter, Inc.*, Case No. 3:20-mc-00005, Dkt. No. 36 (E.D. Va).

Schottlaender Decl. ¶ 4, Ex. C. That suit sought to reveal the identity of the @DevinNunesMom

account. *See* Ex. C., ¶¶ 9, 12, 27. Recently, the user whose identity is sought in the Subpoena

posted on Twitter that he or she is the owner of this previously-suspended account and confirmed

that he or she has indeed been sued by Congressman Nunes:[10]



In one particular Tweet, the user directed a message to Congressman Nunes:[11]

---

[10] *E..g.*, @NunesAlt, Twitter (Jan. 13, 2021, 1:41 AM), https://twitter.com/NunesAlt/status/1349245225647054849;
@NunesAlt, Twitter, (Jan. 13, 2021, 1:41 AM), https://twitter.com/NunesAlt/status/1349245221876322306. *See also*
@NunesAlt, Twitter (Dec. 18, 2020, 6:32 PM), https://twitter.com/NunesAlt/status/1340077411329687552?s=20 ("I
am an American who dislikes Devin Nunes and I am using my first amendment right to criticize an elected member
of our government, as the Founders intended. And that's why that [expletive] is suing me.").

[11] @NunesAlt, Twitter (Dec. 18, 2020, 11:36 PM), https://twitter.com/NunesAlt/status/1340154028848640000?s=20.



Seemingly unsuccessful in gaining any traction with this lawsuit and in therefore identifying the user, Twitter is concerned that a government investigation is now being used to target the same user for political speech on Twitter. As one recent lawsuit alleges, members of the public suspect that Congressman Nunes may be relying upon the government to unmask his critics. *See* Schottlaender Decl., Ex. D.

On November 24, 2020, Twitter received the Subpoena and Gag Order. *See* Schottlaender Decl. ¶ 2. With respect to the Account, the Subpoena requests: (1) "[n]ames (including subscriber names, user names, and screen names);" (2) "[a]ddresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);" (3) "[l]ocal and long-distance telephone connection records;" (4) "[r]ecords of session times and durations, and IP logs;" (5) [l]ength of service (including start date) and types of service utilized [sic];" (6) [t]elephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ('ESN'), Mobile Electronic Identity Numbers ('MEIN'), Mobile Equipment Identifier ('MEID'), Mobile Identification Numbers ('MIN'), Subscriber Identity Modules ('SIM'), MSISDN, International Mobile Subscriber Identifiers ('IMSI'), or International Mobile Station Equipment Identities ('IMEI'));" (7) "[o]ther subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ('IP') addresses);" and (8) "[m]eans and source of payment for

such service (including any credit card or bank account number) and billing records" ("Identifying Information"). Schottlaender Decl., Ex. A.

The Gag Order prohibits Twitter from "disclos[ing] the existence of the Subpoena to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice) for a period of 90 days (commencing on the date of this Order)" because it finds "reasonable grounds to believe that such disclosure will result in flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation." Schottlaender Decl., Ex. B. The Gag Order does not describe the basis for this finding, and Twitter has not received any information from the government about the "reasonable grounds" upon which the Gag Order was based. Schottlaender Decl. ¶ 3, Ex. B.

After receiving the Subpoena, Twitter's counsel promptly contacted the Assistant United States Attorney who had issued it. Schottlaender Decl. ¶ 4. Twitter's counsel explained Congressman Nunes's history of litigation and the Congressman's numerous prior attempts to unmask accounts critical of the Congressman. *Id.* Twitter's counsel asked whether the government could offer any information about its investigation that may alleviate Twitter's concerns. Counsel for the government stated that he understood Twitter's concerns and would attempt to learn more about the investigation and about what he could share with Twitter. *Id.* ¶¶ 4–5. Shortly thereafter, the government stated that it was investigating "potential violations of 18 U.S.C. Section 875(c) (threatening communications in interstate commerce)." *Id.* ¶ 6, Ex. G. Twitter asked whether the government could share the threatening communications at issue, or otherwise state whether those threats had been directed to Congressman Nunes. *Id.* The government replied that it would not provide any additional information about its investigation. *Id.* Accordingly, Twitter files the instant motion to ensure the Court is apprised of the additional facts described above.

**ARGUMENT**

**I.** **The Subpoena should be quashed if it violates the Twitter user's First Amendment right to engage in anonymous speech.**

Twitter asks that the Court scrutinize the government's legal and factual basis for seeking information about the Account. If the Subpoena seeks to unmask a Twitter user for engaging in protected speech critical of Congressman Nunes, as Twitter suspects could very well be the case given the litigation history detailed above, the Court should quash the Subpoena because it violates the First Amendment.

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145 (1983) (internal quotation marks omitted). That protection is not based on "'the truth, popularity, or social utility of the ideas and beliefs which are offered.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964) (citation omitted). Indeed, "[s]peech about the government—especially speech critical of the government—is at the core of 'the freedom of speech.'" *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 419 (D.C. Cir. 2012) (Randolph, J., concurring in part and dissenting in part). No truer is that statement than in its application to political speech, where "[t]o persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.'" *Sullivan*, 376 U.S. at 271 (citation omitted). But for freedom of speech to endure, it must be afforded the "'breathing space . . . to survive.'" *Id.* at 272. And that includes the First Amendment right to remain anonymous. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("The freedom to publish anonymously extends beyond the literary realm.").

The people who use Twitter "ha[ve] a right under the First Amendment to post on the Internet, and to do so anonymously." *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d

1, 4 (D.D.C. 2012). Accordingly, the government cannot compel Twitter to produce information related to the Account unless it "can show 'a compelling interest in the sought-after material' and 'a sufficient nexus between the subject matter of the investigation and the information [it] seek[s].'" *Id.* (quoting *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. 1461 et seq.*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009)). Although the government has not informed Twitter of the specific reason for identifying the user behind the Account, Twitter respectfully submits that based on the facts known to Twitter, the government may not be able to demonstrate any "compelling interest" in its effort to unmask the Account. And to the extent the government seeks information about the Account merely because it engaged in speech that may embarrass an elected official, no such compelling interest could exist. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 575 (1980) (absent overriding interest, First Amendment requires "freedom of communication on matters relating to the functioning of government"). Indeed, "[t]he First Amendment limits the authority of the federal government to criminalize speech." *In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d at 5. In light of Congressman Nunes's prior efforts to silence his critics based on speech he deems unfavorable, Twitter is concerned that criminalization of speech may be at issue here.

Twitter does not know what representations the government has made to this Court about the nature of the Subpoena and "threats via interstate commerce"; however, Twitter is compelled to apprise the Court of the additional facts described above, of which the Court may be unaware. The individual here appears to be engaged in clear First Amendment activity, discussing stances on current events, government policies, and one elected official in particular—Congressman

Nunes. In one recent post, the individual wrote this about a bill Congressman Nunes had sponsored:[12]



In another, the user posted an image of Congressman Nunes with text superimposed over his face:[13]



---

[12] *See* @NunesAlt, Twitter (Jan. 26, 2021, 4:15 AM), https://twitter.com/NunesAlt/status/1353994872349319168.

[13] *See* @NunesAlt, Twitter (Feb. 9, 2021, 4:31 AM), https://twitter.com/NunesAlt/status/1359072331457392641.

What these Tweets, and others the individual has posted, share are statements deserving of First Amendment protection. And, "an investigation threatening First Amendment rights, like any government investigation, [must] be justified by a legitimate law enforcement purpose that outweighs any harm to First Amendment interests." *See United States v. Mayer*, 503 F.3d 740, 753 (9th Cir. 2007).

A case involving an allegedly threatening Tweet about former Congresswoman and presidential candidate Michele Bachmann illustrates the potential problems with the Subpoena. In the Bachmann case, the government issued a subpoena to Twitter for identifying information about a user who the government was investigating potential violations of 18 U.S.C. § 875(c)—the same statute the government claims is the basis for its investigation in this case. *In re Grand Jury Subpoena, No. 11116275*, 846 F. Supp. 2d at 4 n.7. This Court denied the user's motion to quash the subpoena on First Amendment grounds after concluding that the Tweet was "a *prima facie* threat" that the government was entitled to further investigate. *Id.* at 8. The Court reached this conclusion after assessing the specific language of the Tweet at issue, and examining the account as a whole, characterizing it as "[o]ccasionally political but consistently vacuous" and "entirely without merit, comedic or otherwise," with a mere 736 followers. *Id.* at 3. But in doing so, the Court cautioned against allowing its ruling to be interpreted as a license to head down the "slippery slope" of permitting the government to "subpoena any Web site any time any anonymous user made any post containing a mere scintilla of violence." *Id.* at 8. Twitter is concerned that the Subpoena may slide down that slippery slope, and at this stage, it differs in material ways from the Bachmann case. Unlike the Bachmann case, the government will not disclose the nature of the alleged threat under investigation, and the Account appears to be devoted entirely to political parody with an audience (over 100,000 followers) many times larger than the fringe account at

issue in the Bachmann case. *See* @NunesAlt, Twitter, https://twitter.com/NunesAlt. And most importantly, nothing in the Bachmann opinion suggests that the former Congresswoman had Congressman Nunes's well-documented history of using the legal system to lodge frivolous complaints against online critics for the purpose of learning their identities.

As the custodian entrusted with the private identifying information that the government seeks, Twitter is concerned the Subpoena may not be supported by a legitimate law enforcement purpose, and that therefore, there cannot be any need—let alone a compelling need—for the government to unmask the user. As such, Twitter asks that the Court engage in a searching analysis of the government's bases for issuing the Subpoena in order to determine whether the Subpoena violates the First Amendment and should be quashed.

## II.    The Gag Order should be vacated because it cannot withstand strict scrutiny under the First Amendment.

Gag orders, like "any system of prior restraints of expression," are subject to a "heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Any gag order issued under 18 U.S.C. § 2705(b) is therefore invalid unless the government "can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see Matter of Subpoena 2018R00776*, 947 F.3d 148, 156 (3d Cir. 2020) (gag orders to service providers are prior restraints subject to strict scrutiny under the First Amendment); *Matter of Search Warrant for [redacted].com*, No. 16–2316M, 2017 WL 1450314, at *7 (C.D. Cal. Mar. 31, 2017) ("Courts considering the issue have almost uniformly found that [gag orders to service providers] are prior restraints and/or content-based restrictions."); *Taucher v. Rainer*, 237 F. Supp. 2d 7, 13 (D.D.C. 2002) ("[T]he Supreme Court has specifically

and unequivocally demanded that the government show the most compelling reason for *any* prior restraint on speech.") (emphasis in original).

The government cannot clear the hurdle of strict scrutiny here, as it lacks a compelling interest in obtaining the Gag Order. First, as articulated above, Twitter questions the validity of the government's investigation *ab initio*, as it has declined to specify any threats on Twitter's platform by this individual. And even in the Bachmann case, which involved a *prima facie* threat of violence against a major presidential candidate by a fringe account, this Court allowed the affected Twitter user to intervene and advocate for his First Amendment right to engage in anonymous speech. *See In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d at 4 n.6. Given the material differences between this case and Bachmann's, including Congressman Nunes's repeated efforts to use the legal system to silence his critics, there is no compelling interest for issuance of a Gag Order that prevents Twitter from even notifying the individual at issue about the Subpoena and giving him or her a chance to decide whether to lodge his or her own objections.

Second, Twitter has preserved responsive Identifying Information for the Account, and therefore, there is no concern that any of the requested Identifying Information would be deleted.

And third, the government has not explained how disclosure of the Subpoena to the individual at issue could lead to adverse consequences, especially given the individual's apparent involvement in litigation brought by Congressman Nunes. To the extent the government believes the user is likely to destroy evidence or tamper with witnesses, Congressman Nunes's ongoing litigation efforts have already provided ample incentive for that conduct to occur. *Cf. In re Grand Jury Subpoena to Google Inc.*, No. 17-MC-2875 (JO), 2017 WL 4862780, at *2 (E.D.N.Y. Oct. 26, 2017) (where "the risk already exists that [ ] targets will take steps to flee, alter or destroy evidence, or otherwise impede the investigation's progress" the court may not be able

to "infer that [a provider]'s disclosure of the subpoena's existence would create or exacerbate any such risk"). Moreover, a lawsuit filed in this Court on March 3, 2021 indicates that members of the public suspect Congressman Nunes may be using the government to unmask his critics, and therefore, there is no need to maintain the secrecy of the Subpoena. *See* Schottlaender Decl., Ex. D.

As the Gag Order does not serve a compelling interest, this Court should vacate it.

## CONCLUSION

For these reasons, Twitter respectfully requests that the Court quash the Subpoena and vacate the Gag Order.

Dated: March 10, 2021                    Respectfully submitted,

By: */s/ John K. Roche*
    John K. Roche (D.C. Bar. No. 491112)
    PERKINS COIE LLP
    700   13th   St.,   N.W.,   Suite   800
    Washington, D.C. 20005-3960
    Telephone:  202-434-1627
    Facsimile:  202-654-6211
    JRoche@perkinscoie.com

    Attorneys for Twitter, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2021, I sent a copy of Twitter, Inc.'s Motion to Quash Subpoena and Vacate Nondisclosure Order and Memorandum in Support via email to DCD_CMECF_CR@dcd.uscourts.gov, as prescribed on the "COVID-19 Clerk's Office Operations Information" page. I hereby certify that on March 10, 2021, I also served the same document by mail and email on counsel for the United States:



DATED:  March 10, 2021

*/s/ John K. Roche*
John K. Roche (D.C. Bar. No. 491112)
PERKINS COIE LLP
700    13th    St.,    N.W.,    Suite    800
Washington, D.C. 20005-3960
Telephone:  202-434-1627
Facsimile:  202-654-6211
JRoche@perkinscoie.com

Attorneys for Twitter, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA GJ2020111968168 AND APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2705(B) | SC NO. 1:20-sc-03082 |
| | **Filed Under Seal** |
| Twitter Account:  @NunesAlt | |

### DECLARATION OF HAYDEN M. SCHOTTLAENDER IN SUPPORT OF TWITTER, INC.'S MOTION TO QUASH SUBPOENA AND VACATE NONDISCLOSURE ORDER

I, Hayden M. Schottlaender, declare as follows:

1.    My name is Hayden M. Schottlaender. I am an associate with the law firm Perkins Coie LLP, counsel for Twitter. I am of sound mind, over the age of 21, have never been convicted of a felony, and am fully authorized and competent to make this Declaration. The facts and statements contained herein are made on the basis of my personal knowledge and are true and correct. If called to testify to said statements, I could and would testify competently thereto.

2.    On November 24, 2020, Twitter received a subpoena in the above-captioned case (the "Subpoena"). The Subpoena was accompanied by a nondisclosure order (the "Gag Order") prohibiting Twitter from disclosing to anyone, except Twitter's lawyers, the existence of the Subpoena. True and correct copies of the Subpoena and accompanying Gag Order are attached as **Exhibits A and B**, respectively.

3.    To date, I have personally and exclusively represented Twitter in its interactions with the United States Department of Justice (the "Government") in connection with the Subpoena and Gag Order. I have not received any information from the Government about the "reasonable grounds" upon which the Gag Order was issued.

4.       After Twitter received the Subpoena, I contacted ████████████, the Assistant United States Attorney, whose name and contact information appear at the bottom of the Subpoena. We participated in a phone call on January 26, 2021. On that call, I explained to ██ ████████ that Congressman Devin Nunes has a litigious history, which included suing Twitter. A true and correct copy of a complaint Congressman Nunes filed against Twitter and several Twitter users, including @DevinNunesMom, is attached as **Exhibit C**. I explained that Congressman Nunes had previously and unsuccessfully attempted, in several ways, to obtain information about his critics. And I explained that Twitter was concerned that the Subpoena was merely another attempt by Congressman Nunes to do the same. A true and correct copy of a complaint recently filed in this Court, which alleges that Congressman Nunes may be using the government to unmask his critics, is attached as **Exhibit D**.

5.       Attached hereto as **Exhibits E and F** are true and correct copies of Congressman Nunes's Interrogatories and Request for Production of Documents in his lawsuit against Twitter, and the Virginia Circuit Court's dismissal of the lawsuit before Twitter had to comply with these discovery requests, respectively. ████████████ stated that he understood Twitter's concerns, would try to gather more information about the investigation, and would contact me later with more information.

6.       The next day, January 27, 2021, ████████████ emailed me and stated that "the grand jury subpoena was issued as part of a criminal investigation into potential violations of 18 U.S.C. Section 875(c) (threatening communications in interstate commerce)." No further information was provided to me. I asked ████████████ whether he would be able to share the threatening communication with me, or otherwise tell me whether the "threatening communications" were directed at Congressman Nunes. ████████████ replied: "I have consulted

with my supervisor here at the US Attorney's Office, and we will not agree to provide any further information at this time." The Government has not provided me or Twitter with any additional information about the Subpoena since that January 27 exchange of emails. A true and correct copy of my conversation with ███████ is attached as **Exhibit G**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2021

_/s/ Hayden M. Schottlaender_
Hayden M. Schottlaender
Texas Bar No. 24098391

# EXHIBIT A



U.S. Department of Justice

Michael R. Sherwin
Acting United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

November 24, 2020

<u>VIA Web Portal</u>

C/O Trust & Safety - Legal Policy
Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Fax: 415-222-9958

Re:   Grand Jury Subpoena #GJ2020111968168
      USAO #2020R00007

Dear Sir/Madam:

  Pursuant to a criminal investigation being conducted by the United States Attorney's Office, it is required that you furnish the requested records as described in the attached subpoena.

  In lieu of personally appearing before the Grand Jury on the date indicated, you may comply with this grand jury subpoena by promptly providing the undersigned Assistant U.S. Attorney with the requested records.  If you choose to provide the requested records voluntarily, please provide them in a non-proprietary electronic format via FedEx, UPS or DHL.  Also enclosed please find a blank "Declaration of Custodian of Records" form.  It may save time and costs if an appropriate person at your business could complete the form and return it with the records.  A properly completed "Declaration of Custodian of Records" form will make it more likely that we could present the records at trial without requiring you or another employee to come to court and testify.

  Under the Electronic Communications Privacy Act, 18 U.S.C. § 2701 et seq., electronic communications services providers responding to a grand jury subpoena for production of certain records are entitled to reimbursement for some of the costs involved in compliance. Reimbursement may not be made for records or other information relating to telephone toll records and listings described in 18 U.S.C. § 2703(c)(2).  Please note that under the Act, the Department of Justice will not reimburse expenses incurred for the production of information kept in the ordinary course of business.  An exception can be made if compliance with a grand jury subpoena requires the expenditure of unusual effort or resources.  In that circumstance, reimbursement of the "reasonable cost" of such services can be made if the government and subpoena recipient mutually agree on the amount, or if the court orders reimbursement.

If you believe that you are entitled to reimbursement, please send a full and complete itemized statement for all costs in an invoice that makes clear the basis for the reimbursement request.

No reimbursement will be made without (1) a full and complete itemized statement of all costs bearing your taxpayer identification number, (2) a completed usa-212 form, and (3) a copy of the subpoena.

Moreover, no reimbursements will be paid for partial compliance with the grand jury subpoena.  Accordingly, no invoice should be submitted to this office until compliance with the grand jury subpoena is complete, and the accompanying invoice represents a final and complete invoice for all qualified costs involved in that compliance.  **Please submit all invoices directly to the Assistant United States Attorney at the address indicated in this letterhead.**

Enclosed please find a nondisclosure order from the court directing Twitter, Inc. not to notify any person (including the subscriber or customer) of the existence or content of this subpoena. You are directed not to disclose the existence of this subpoena or the fact of your compliance.  Any such disclosure on your part could impede the investigation being conducted and thereby interfere with the enforcement of the law.

We appreciate your cooperation in this matter.  If you have any questions, please contact this office at the number below.

Sincerely,

Michael R. Sherwin
Acting United States Attorney

By:



AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
for the

**District of Columbia**

### SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:  C/O Trust & Safety - Legal Policy
Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA  94103

     **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| | |
|---|---|
| Place: U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA<br>     U.S. Courthouse, 3rd Floor    Grand Jury # 20-2<br>     333 Constitution Avenue, N.W.<br>     Washington, D.C. 20001 | Date and Time:<br>Tuesday, December 23, 2020 at 9:00 AM |

     You must also bring with you the following documents, electronically stored information, or objects:

PLEASE SEE ATTACHMENT

In lieu of personally appearing before the Grand Jury on the date indicated, you may comply with this grand jury subpoena by promptly providing **SA Crystal Griner via crystal.griner@uscp.gov** with the requested records.

Date:  <u>November 24, 2020</u>

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, telephone number and email of the Assistant United States Attorney, who requests this subpoena, are:

Subpoena  #GJ2020111968168
USAO #2020R00007
Preparer:  MWATTS

**U.S. Department of Justice**
Washington, D.C. 20530

Request for Communications Content, Records or Other Information Under the Electronic
Communications Privacy Act (ECPA). (Authorization, Purchase Order and Receiving Report)

This form shall be used when requesting communications content, records, or other information from electronic communications or remote computing service providers under the ECPA.

| 1 Tracking Number: | 2 Date Order Prepared: | 3 USAO Number: |
|---|---|---|
| **GJ2020111968168** | **11/19/2020** | **2020R00007** |

## Section A – Authorization and Purchase Order

| 4 Name and Address of Service Provider: | | |
|---|---|---|
| **Twitter, Inc.** | A. | |
| **1355 Market Street, Suite 900** | Funding Certification & Authorization: | Budget Official Signature    Funding Available    Date |
| **San Francisco, CA 94103** | B. | Approving Official Signature    Date |

| 5 Deliver Records To: | Send Completed USA-212 Form & Invoice To: | 6 Return Date: |
|---|---|---|
| ███████████████ | | **12/8/2020** |

7 Remarks: Do not proceed with compliance if the total cost will exceed _____ without prior approval. To obtain approval, call the requestor listed in Item 8.
If invoicing for these services is expected to exceed 120 days, please notify the United States Attorney's Office immediately to ensure funds remain available for payment. Please see the attached Important Notice for additional information on invoicing and other requirements for reimbursement.

| 8 Name of Requestor: | 9 Telephone Number: | 10 Date of request: |
|---|---|---|
| ███████████████ | ███████ | **11/24/2020** |

## Section B - ECPA Service Provider Invoice

| | | | Unit Price | | |
|---|---|---|---|---|---|
| 11A Invoice Number: | | Quantity | Cost | Per | Amount |
| 11B Tax ID Number: | | | | | |

11C  Service(s)/Records Provided:

The costs above (or on the attached invoice) represent direct costs and have been incurred in searching for, assembling, reproducing or otherwise providing the requested information.

| 12  Signature of Service Provider Representative: | 13  Date Signed: | Total Amount Claimed By Service Provider |
|---|---|---|

## Section C - Receiving Report

| | 16  Disallowance (See Attached) |
|---|---|
| 14  I certify that the articles and services listed were received: | 17 Net to Service Provider |
| 15  Date Received: | |

| 18  Electronic Communications Privacy Act - Public Law 99-508 (18 U.S.C. 2701-2712) Request Pursuant To: *(Only One Section at Left Should Be Checked)* | | 19  Signature of Approving Official:        Date: |
|---|---|---|

| SECTION | | OBJECT CLASS | |
|---|---|---|---|
| ☐ 2702 | Voluntary Disclosure | 2570 | 20  Funding Source |
| ☒ 2703 | Compelled Disclosure | 2570 | Accounting Code: |
| | ☐ Search Warrant | 2570 | |
| | ☒ Grand Jury Subpoena | 2570 | Program |
| | ☐ Court Order | 2570 | 21 Other Accounting/Fund Information: |
| | ☐ Administrative or Judicial Subpoena | 2570 | Program Code:        Project Code: YREGDOC: |
| ☐ 2704 | Request for Information Following Preservation | 2570 | Call Number (if applicable): |

OBL Month (YRMO):
Tax ID Number:

22 Remarks:

The costs above (or on the attached invoice) appear to be reasonably necessary and to have been directly incurred in searching for, assembling, reproducing or otherwise providing requested information

Signature of United States Attorney's Office Representative        Date

FORM USA-212
EEB. 2014

## <u>DECLARATION OF CUSTODIAN OF RECORDS</u>

Pursuant to 28 U.S.C. §1746, I, the undersigned, hereby declare:

My name is _____ .
<em>(name of declarant)</em>

 I am a United States citizen and I am over eighteen years of age.  I am the custodian of records of the business named below, or I am otherwise qualified as a result of my position with the business named below to make this declaration.  I have knowledge of the record keeping system used by this business; this includes how records are created and maintained.

I am in receipt of a United States District Court Subpoena #GJ2020111968168 dated November 24, 2020, signed by Assistant United States Attorney ███████████, requesting specified records of the business named below.

Attached hereto are _____ pages of records regarding _____
<em>(Brief description  of type of documents being subpoenaed)</em>
_____ responsive to the subpoena.  I understand  how these responsive documents were created.  Pursuant to Rules 902(11) and 803(6) of the Federal Rules of Evidence, I hereby certify that the records attached hereto:

(1) were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters;

(2) were kept in the course of regularly conducted business activity, in that the records were created and preserved pursuant to established procedures, and were relied upon by an employee or this business; and

(3) were made as part of the regularly conducted business activity as a regular practice, in that the records were created and preserved as part of routine reflections of the normal operations of this business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ .
<em>(date)</em>

_____
<em>(signature of declarant)</em>

_____
<em>(name and title of declarant)</em>

_____
<em>(name of business)</em>

_____
<em>(business address)</em>

_____
<em>(business address)</em>

<u>Definitions of terms used above</u>:

As defined in Fed.R.Evid. 803(6),  "record" includes a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses.  The term, "business" as used in Fed.R.Evid. 803(6) and the above declaration includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**ATTACHMENT**
**Twitter, Inc.**

All customer or subscriber account information for any and all accounts associated with the following identifiers listed below, from **October 1, 2020 to the Present**:

- **@NunesAlt**

In addition, for each such account, the information shall include the subscriber's:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long distance telephone connection records;

4. Records of session times and durations, and IP logs;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), MSISDN, International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Station Equipment Identities ("IMEI"));

7. Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses);

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

# INSTRUCTIONS FOR PRODUCTION OF RECORDS

I.   **General:**

    a. Records existing as **Electronically Stored Information (ESI)** shall be produced in **non-proprietary electronic form** and shall include text data and image data held:

        i. In your record retention systems; and/or

        ii. By your technology, data, or other service provider(s).

    b. Records that do not exist as ESI may be produced in paper or other original format and may be converted to image or text data and provided as ESI, unless originals are required.

II.   **Text Data**

    a. Text data relating to transactions shall be produced within a data file:

        i. Using a delimited ASCII text data format; or

        ii. Using software that can export to a commonly readable, non-proprietary file format without loss of data.

    b. Text data files relating to transactions shall include field descriptions (e.g., account number, date/time, description, payee/payor, check number, item identifier, and amount).

III.   **Image Data**

    a. Image data shall be produced in graphic data files in a commonly readable, non-proprietary format with the highest image quality maintained.

    b. Image data of items associated with transactions (e.g., checks and deposit slips) shall be:

        i. Produced in individual graphic data files with any associated endorsements; and

        ii. Linked to corresponding text data by a unique identifier.

IV.   **Encryption/Authentication**

    a. ESI may be transmitted in an encrypted container *(e.g. flash drive, CD/DVD)*. Decryption keys and/or passwords shall be produced separately at the time the data are produced.  *Please do not encrypt individual file contents if the container is encrypted.*

    b. Authentication, such as hash coding, may be set by agreement.

    c. Affidavits or certificates of authenticity may be included as part of the electronic production.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE APPLICATION OF USA FOR
2705(b) NONDISCLOSURE ORDER FOR
GRAND JURY SUBPOENA
GJ2020111968168

SC No. 20-sc-03082

**Filed Under Seal**

## ORDER

This matter having come before the Court pursuant to an application under 18 U.S.C.
§ 2705(b) requesting an order directing Twitter, Inc. ("PROVIDER"), an electronic
communication and/or remote computing service provider located in San Francisco, California,
not to notify any other person of the existence of subpoena number GJ2020111968168 issued by the
United States on behalf of a federal Grand Jury empanelled in the United States District Court for
the District of Columbia (the "Subpoena"), the Court finds reasonable grounds to believe that such
disclosure will result in flight from prosecution, destruction of or tampering with evidence,
intimidation of potential witnesses, and serious jeopardy to the investigation.

IT IS THEREFORE ORDERED that, pursuant to 18 U.S.C. § 2705(b), PROVIDER and
its employees shall not disclose the existence of the Subpoena to any other person (except attorneys
for PROVIDER for the purpose of receiving legal advice) for a period of 90 days (commencing
on the date of this Order), unless the period of nondisclosure is later modified by the Court.

IT IS FURTHER ORDERED that the application and this Order are sealed until otherwise
ordered by the Court.

_____
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT C

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF HENRICO

| | | |
|---|---|---|
| DEVIN G. NUNES | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. CU9-1715 |
| v. | ) | |
| | ) | **TRIAL BY JURY** |
| | ) | **IS DEMANDED** |
| TWITTER, INC., | ) | |
| ELIZABETH A. "LIZ" MAIR, | ) | |
| MAIR STRATEGIES, LLC, | ) | |
| "DEVIN NUNES' MOM" | ) | |
| [@DevinNunesMom] | ) | |
| "DEVIN NUNES' COW" | ) | |
| [@DevinCow] | ) | |
| | ) | |
| Defendants. | ) | |

# COMPLAINT

Plaintiff, Devin G. Nunes, by counsel, files the following Complaint against defendants, Twitter, Inc. ("Twitter"), Elizabeth A. "Liz" Mair ("Mair"), Mair Strategies, LLC ("Mair Strategies"), "Devin Nunes' Mom" (@DevinNunesMom) and "Devin Nunes' cow" (@DevinCow), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in an amount not less than **$250,000,000.00,** (b) prejudgment interest on the principal sum awarded by the Jury from March 18, 2018 to the date of Judgment at the rate of six percent (6%) per year pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), injunctive relief, and (d) court costs – arising out of defendants' negligence, defamation *per se*, insulting words, and civil conspiracy.

1

March 19 2019
RECEIVED & FILED IN OFFICE
Susan Bouler
Deputy Clerk, Henrico Circuit Court

# I. **INTRODUCTION**

1.      Twitter is an information content provider.[1]  Twitter creates and develops[2] content,[3] in whole or in part, through a combination of means:  (a) by explicit censorship

---

[1]      The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service. *See Title 47 U.S.C. § 230(f)(3)*.  The word *responsible* ordinarily has a normative connotation. *See* The Oxford English Dictionary 742 (2nd ed. 1998) (stating one definition of *responsible* as "Morally accountable for one's actions.").  As one authority puts it: "[W]hen we say, 'Every man is *responsible* for his own actions,' we do not think definitely of any authority, law, or tribunal before which he must answer, but rather of the general law of right, the moral constitution of the universe...." James C. Fernald, Funk & Wagnalls Standard Handbook of Synonyms, Antonyms, and Prepositions 366 (1947).  Synonyms for *responsibility* in this context are *blame, fault, guilt,* and *culpability*. *See* Oxford American Writer's Thesaurus 747 (2nd ed. 2008).  Accordingly, to be "responsible" for the development of offensive content, such as defamation, one must be more than a neutral conduit for that content.  One is not "responsible" for the development of offensive content if one's conduct was neutral with respect to the offensiveness of the content (as would be the case with the typical Internet bulletin board).  We would not ordinarily say that one who builds a highway is "responsible" for the use of that highway by a fleeing bank robber, even though the culprit's escape was facilitated by the availability of the highway.  Twitter is "responsible" for the development of offensive content on its platform because it in some way specifically encourages development of what is offensive about the content. *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1198-1199 (10th Cir. 2009) (citing *Fair Housing of Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) ("a website helps to develop unlawful content ...if it contributes materially to the alleged illegality of the conduct.").

[2]      The word *develop* derives from the Old French *desveloper*, which means, in essence, to unwrap. Webster's Third New International Dictionary 618 (2002) (explaining that *developer* is composed of the word *veloper,* meaning "to wrap up," and the negative prefix *des* ).  The dictionary definitions for *develop* correspondingly revolve around the act of drawing something out, making it "visible," "active," or "usable." *Id.* Thus, a photograph is developed by chemical processes exposing a latent image. *See id.* Land is developed by harnessing its untapped potential for building or for extracting resources. *See id.* Likewise, when confidential information is exposed to public view that information is "developed." *See id.* (one definition of *develop* is "to make actually available or usable (something previously only potentially available or usable)"). *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009).

[3]      "Content" is information.  It is the principal substance (such as written matter, illustrations, or music) offered by a website. [https://www.merriam-webster.com/dictionary/content].

of viewpoints with which it disagrees, (b) by shadow-banning conservatives, such as Plaintiff, (c) by knowingly hosting and monetizing content that is clearly abusive, hateful and defamatory – providing both a voice and financial incentive to the defamers – thereby facilitating defamation on its platform, (d) by completely ignoring lawful complaints about offensive content and by allowing that content to remain accessible to the public, and (e) by intentionally abandoning and refusing to enforce its so-called Terms of Service and Twitter Rules – essentially refusing to self-regulate – thereby selectively amplifying the message of defamers such as Mair, Devin Nunes' Mom and Devin Nunes' cow, and materially contributing to the libelousness of the hundreds of posts at issue in this action.

2.    Twitter created and developed the content at issue in this case by transforming false accusations of criminal conduct, imputed wrongdoing, dishonesty and lack of integrity into a publicly available commodity used by unscrupulous political operatives and their donor/clients as a weapon.  Twitter knew the defamation was (and is) happening.  Twitter let it happen because Twitter had (and has) a political agenda and motive:  Twitter allowed (and allows) its platform to serve as a portal of defamation in order to undermine public confidence in Plaintiff and to benefit his opponents and opponents of the Republican Party.  In this case, Twitter contributed materially to the illegal conduct of defamers Mair, Devin Nunes' Mom and Devin Nunes' cow.  Twitter, by its actions, intended to generate and proliferate the false and defamatory statements about Plaintiff in order to influence the outcome of the 2018 Congressional election and to intimidate Plaintiff and interfere with his important investigation of corruption by the

3

Clinton campaign and alleged Russian involvement in the 2016 Presidential Election.
Twitter knowingly acted as a vessel of opposition research.

## II.  PARTIES

3.       Plaintiff, Devin G. Nunes ("Nunes" or "Plaintiff"), is a citizen of
California.  Born October 1, 1973, Nunes has served in the United States House of
Representatives since 2003.  He currently represents California's 22nd Congressional
District, which is located in the San Joaquin Valley and includes portions of Tulare and
Fresno Counties.  He and his wife have three daughters.   He is the author of the
book, *Restoring the Republic*, which was published in September 2010.  Nunes was born
in Tulare, California.  His family is of Portuguese descent, having emigrated from the
Azores to California.  From childhood, he worked on a farm that his family operated in
Tulare County for three generations.  Nunes raised cattle as a teenager, used his savings
to begin a harvesting business, and then bought his own farmland with his brother.
Nunes graduated from Tulare Union High School.  After associate's work at College of
the Sequoias, Nunes graduated from Cal Poly San Luis Obispo, where he received a
bachelor's degree in agricultural business and a master's degree in agriculture.  Nunes
was first elected to public office as one of California's youngest community college
trustees in state history at the age of 23.  As a member of the College of the Sequoias
Board from 1996 to 2002, he was an advocate for distance learning and the expansion of
programs available to high school students.  In 2001, he was appointed by President
George W. Bush to serve as California State Director for the United States Department of
Agriculture's Rural Development section.  He left this post to run for California's 21st
Congressional District and now serves in the 22nd District as a result of redistricting in

4

2010. Nunes serves as Ranking Member of the House Permanent Select Committee on Intelligence, having been appointed to the Committee in the 112th Congress and serving as Committee Chairman during the 114th and 115th Congresses. He was appointed to the Ways and Means Committee in the 109th Congress and now serves as a Ranking Member of the Health Subcommittee and a member of the Trade Subcommittee, having served as Chairman of the Trade Subcommittee in the 113th Congress. Nunes previously served as a member of the House Budget Committee during the 111th Congress. In the 108th Congress, his first term in the House of Representatives, he served on the House Resources Committee, in which he was Chairman of the National Parks Subcommittee, and on the Agriculture and Veterans Affairs Committees. Congressman Nunes has traveled extensively to war zones to meet with soldiers and examine first-hand their status. As a member of the House Permanent Select Committee on Intelligence, he participates in oversight of the U.S. national security apparatus, including the intelligence-related activities of seventeen agencies, departments, and other elements of the United States Government. Nunes authored the Hubbard Act of 2008 (H.R. 5825), which was named in honor of the Hubbard brothers of California – Jared, Nathan, and Jason. Jared and Nathan lost their lives serving in Iraq. Jason was discharged as a sole survivor, but was denied separation benefits upon leaving the Army. The Hubbard Act, which was enacted into law, provides sole survivors with numerous benefits that were already offered to other soldiers honorably discharged. It relieves sole survivors from repaying any portion of their enlistment bonus; entitles them to the educational benefits of the Montgomery GI Bill; and allows them to receive separation pay and transitional healthcare coverage. [https://nunes.house.gov/about/; https://www.devinnunes.com/bio].

4.     Nunes' career as a United States Congressman is distinguished by his

honor, dedication and service to his constituents and his country, his honesty, integrity,

ethics, and reputation for truthfulness and veracity.

5.     In 2018, during his last re-election for the 22nd Congressional District,

Nunes endured an orchestrated defamation campaign of stunning breadth and scope, one

that no human being should ever have to bear and suffer in their whole life.  Unlike prior

elections, where Nunes won by sweeping majorities, Nunes won on November 6, 2018

by   a   much   narrower   margin,   receiving   52.7%   of   the   222,379   votes.

[https://www.nytimes.com/elections/results/california-house-district-22].  The malicious,

false and defamatory statements and relentless attacks on Nunes' reputation did not stop

after he won the Congressional election in 2018.  The defamation continues.  It must be

stopped.

6.     Defendant, Twitter, is a Delaware corporation.  Its principal executive

office (headquarters) is in California.  Twitter is a public company (NYSE:TWTR) with

35+ offices worldwide.  In its 2017 annual report on Form 10-K, filed with the United

States  and  Exchange  Commission  ("SEC"),  Twitter  made  the  following

representations about its business and primary service:

> Twitter is the best place to see what's happening and what people are talking about. Every day, instances of breaking news, entertainment, sports, politics, big events and everyday interests happen first on Twitter. Twitter is where the full story unfolds with live commentary and where live events come to life unlike anywhere else. Our primary service can be accessed on a variety of mobile devices, at twitter.com and via SMS.

> Our primary service, Twitter, is a global platform for public self-expression and conversation in real time. Twitter allows people to consume, create, distribute and discover content and has democratized content creation and distribution. The reach of Twitter content is not limited to our logged-in users on the Twitter platform, but rather extends to a larger global audience.
>
> The public nature of the Twitter platform allows us and others to extend the reach of Twitter content beyond our properties. Media outlets and our platform partners distribute Tweets beyond our properties to complement their content by making it more timely, relevant and comprehensive. These outlets and partners also add value to our user experience by contributing content to our platform. Many of the world's most trusted media outlets, including the BBC, CNN, Bloomberg and the Associated Press, regularly use Twitter as a platform for content distribution.

Twitter is ubiquitous.  Twitter is at home in Virginia.  Twitter is registered to transact business in Virginia (VA SCC Id. No. F198299-2); it maintains a registered office and registered agent in Glen Allen, Virginia (Henrico County); millions of Virginians have Twitter accounts and use Twitter on a daily basis; Twitter targets Virginians every minute of every day with advertisements of all kinds and earns millions of dollars in revenues from its Virginia source customers. Twitter's technology platform and information database enables it to target citizens based on "audience attributes" like "geography, interests, keyword, television conversation, content, event and devices".  Twitter's targeting capabilities allow it to develop content and act as a political action committee and, as happened in this case, to squelch the voice and assassinate the character of its political opponents.  Twitter makes it possible "for advertisers to promote their brands, products and services, amplify their visibility and reach, and complement and extend the conversation around their advertising campaigns" in a variety of ways.  Through the use of "Promoted Products", such as "Promoted Tweets",[4] "Promoted Accounts" and

---

[4]     Using its "proprietary algorithm and understanding of each user's Interest Graph," Twitter delivers Promoted Tweets that are "intended to be relevant to a particular user."  Twitter's goal is to "enable advertisers to create and optimize successful marketing campaigns – and pay either on impressions delivered or pay only for the user actions that are aligned with their marketing objectives."

"Promoted Trends", Twitter enables advertisers to target Virginians based on a variety of factors, including a user's "Interest Graph".[5]

7.     Defendant, Mair, is a citizen of Virginia.  She lives and works in Arlington County.  Mair joined Twitter in either 2007 or 2010.  She currently operates a twitter account, titled "BrandValue$4B", with the handle/tag "@LizMair" and 37,900 followers. [https://twitter.com/LizMair?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5 Eauthor; *see also* https://twitter.com/lizamair?lang=en].  Mair's Twitter profile discloses that she is a "Comms strategist. Blunt ('16). Walker ('12-'15).[6] Rand Paul ('13). Perry ('12) Fiorina ('10); former RNC Online Comms Director; Tory; libertarian; Arsenal fan". Mair claims that she is "the US' leading right-of-center online communications operative". [https://www.lizmair.com/biography.php#navbar].  In December 2015, Mair founded a super PAC called "Make America Awesome" (FEC Id. # C00594176), whose sole (and failed) purpose was to block and reverse Donald's Trump's ascent in politics by using "unconventional and cost-effective tactics".[7]  Mair claims that since 2011 she has "advised multiple Fortune 500, FTSE 100 and other publicly-traded corporate clients, as

---

[5]     Twitter conducts surveillance on its users, collects data on its users and sells that data to advertisers and others.  The "Interest Graph maps, among other things, interests based on users followed and actions taken on our platform, such as Tweets created and engagement with Tweets."

[6]     Mair was terminated from the Walker campaign shortly after she tweeted derogatory    and    disparaging    statements    about    the    residents    of    Iowa. [https://www.desmoinesregister.com/story/news/politics/2015/03/16/scott-walker-digital-chief-taken-swipes-iowa/24865861/; https://thehill.com/blogs/ballot-box/236052-under-fire-walker-aide-liz-mair-resigns.

[7]     Plaintiff was a member of the Trump transition team, and is widely recognized for his arguments that the accusations that President Trump and his associates colluded with Russia are false.  Mair is famous for her appearance on CNN, where she referred to then presidential candidate Donald Trump as a "loud mouth dick". https://www.realclearpolitics.com/video/2016/08/04/republican_strategist_liz_mair_trum p_a_loud_mouth_dick.html.

well as numerous large trade associations and prominent non-profits on communications

in the US, the UK and the EU." On her *LinkedIn* profile, Mair admits that:

> What do I do for these clients? Anonymously smear their opposition
> on the Internet.
>
> More broadly? Get sh*t done.

[https://www.linkedin.com/in/liz-mair-76b03a2/]. During Nunes re-election campaign in

2018, Mair conspired with (and presumably was paid by) one or more as-yet unknown

"clients" to attack and smear Nunes. True to her word on *LinkedIn*, Mair relentlessly

smeared and defamed Nunes during the campaign, filming stunts at Nunes' office in

Washington, D.C. and posting them online, publishing videos on YouTube that falsely

accused Nunes of multiple crimes, repeatedly publishing false and defamatory statements

on Twitter,[8] defaming Nunes online and to the press, and filing fraudulent ethics

complaints against Nunes accusing him, *inter alia*, of violating House Ethics Rules, *e.g.*:

> https://www.youtube.com/watch?v=fOp7se7n9XI;
>
> https://www.youtube.com/watch?v=lHGYMcVN_SQ;

---

[8]     Mair falsely tweeted to her 37,900 followers, *inter alia*, that Nunes "voted
for warrantless wiretapping and unlimited surveillance of Americans' emails (incl Carter
Page's)" [https://twitter.com/LizMair/status/1041873937427300352]; that Nunes broke
the law when he "spent contributions that are supposed to be used for the express
purposes of the PAC or committee in question, and not for financing their personal
lifestyle choices. That is a legal problem, not just an ethical or optics-related one"
[https://twitter.com/LizMair/status/1032990757869813761]; and that Nunes leaked text
messages between a lobbyist and Senator Mark Warner to Fox News
[https://twitter.com/LizMair/status/969409912366338049]. Even after Nunes won the
election, Mair continued to attack him, stating, *inter alia*, that Nunes was "still a clown
with big league ethical issues that may well cost him his seat in 2020"
[https://twitter.com/LizMair/status/1095574579223949312].

https://www.youtube.com/watch?v=aUseOu2ReS4;[9]

https://www.crowdpac.com/campaigns/386770/hold-devin-nunes-

accountable?ref_code=share&utm_source=sharer-

ask&utm_medium=receipt&utm_campaign=S0qacrvwpg4P2coDlGw1ujXljN1y7HxX&u

tm_content=20&source_code=tw-receipt-first;[10]

https://www.fresnobee.com/news/politics-government/politics-columns-

blogs/political-notebook/article214693435.html;[11]

https://thehill.com/blogs/blog-briefing-room/news/398980-activist-group-trolls-

nunes-with-new-sneakers-to-run-away-from;

https://swampaccountabilityproject.com/letter/.

As part of her smear campaign on behalf of clients, Mair was out to "stick it" to Nunes in

2018.  By her own admissions, she "hates Devin Nunes" and "dumped[12] a lot" on Nunes.

[https://twitter.com/LizMair/status/1046599052996096001].     Mair   tweeted   "HOLY

---

[9]   Among the false statements published by Mair in this video is that "Nunes is still entangled with a winery implicated in a scandal involving his co-investors, cocaine and child prostitutes".

[10]   In this publication, Mair makes the following false statements about Nunes: "Ethical leadership in government?  He's invested in a winery that allegedly solicited capital by using underage prostitutes.  Really".

[11]   Mair published the following statement to the *Fresno Bee*, "OCE [the Office of Congressional Ethics] should prioritize a review of Rep. Nunes' investment and involvement in the Alpha Omega Winery, and the facts reported by The Fresno Bee. Such review should be undertaken as swiftly as possible".

[12]   Opposition research (also called "oppo" research) is the practice of collecting information on a political opponent or other adversary that can be used to discredit or otherwise weaken them.  The information can include biographical, legal, criminal, medical, educational, or financial history or activities.  "Oppo dumps" are used by political campaigns to systematically supply files of damaging information to press outlets, including matters of the public record, video footage from party archives and private collections, as well as private intelligence gathered by operatives.

CRAP; A yacht, cocaine, prostitutes:   Winery partly owned by Nunes sued after fundraiser event". [https://twitter.com/LizMair/status/999407730220650497].   Mair's tweet, with an article by the *Fresno Bee* attached, implied that Nunes colluded with prostitutes and cocaine addicts, that Nunes does cocaine, and that Nunes was involved in a "Russian money laundering front".   One of Mair's most egregious and defamatory tweets about Nunes was the following:



> **BrandValue$4B** 🐦
> @LizMair
>
> To be fair, I think the @fresnobee writing up your investment in a winery that allegedly used underage hookers to solicit investment-- an allegation you've known about for years, during which you've stayed invested in it, I might add-- did surprise you.
>
> **Devin Nunes** 🐦 @DevinNunes
> Nothing surprises me any more... twitter.com/byronyork/stat...
>
> 11:10 PM · Jun 22, 2018 · Twitter Web Client
>
> **1.6K** Retweets      **4.4K** Likes

[https://twitter.com/LizMair/status/1010359462891327490].   At all times relevant to this action, Mair harbored spite, ill-will, actual malice, and a demonstrated desire to injure Nunes' good name and reputation.   Mair's tweets about Nunes, for example, referred to the Congressman with disdain as "Dirty Devin".

8.      Defendant, Mair Strategies, is a Virginia limited liability company, active and in good standing.   Mair is the sole member and manager of Mair Strategies.   On its

website, www.mairstrategies.com, Mair Strategies claims to be a "boutique communications and public relations firm, with specialties in online, political, and crisis communications, as well as opposition research formulation and seeding." Mair Strategies represents that it is an "entirely virtual firm staffed by politics veterans" – "the firm is 'lean and mean' and brings an aggressive, hard-hitting, presidential campaign-style approach to issues work it manages and executes for its clients." [https://www.mairstrategies.com/about.php#navbar]. At all times relevant to this action, Mair acted within the scope of her employment for Mair Strategies, acted during work hours and while conducting Mair Strategies' business, using a Twitter account that linked back to Mair Strategies, and with the knowledge and actual or apparent authority of Mair Strategies. Mair Strategies is liable for Mair's defamation of Nunes under the doctrine of *respondeat superior*.

9.     Defendant, Devin Nunes' Mom, is a person who, with Twitter's consent, hijacked Nunes' name, falsely impersonated Nunes' mother, and created and maintained an account on Twitter (@DevinNunesMom) for the sole purpose of attacking, defaming, disparaging and demeaning Nunes. Between February 2018 and March 2019, Twitter allowed @DevinNunesMom to post hundreds of egregiously false, defamatory, insulting, abusive, hateful, scandalous and vile statements about Nunes that without question violated Twitter's Terms of Service and Rules, including a seemingly endless series of tweets that falsely accused Nunes of obstruction of justice, perjury, misuse of classified information, and other federal crimes:

12

 **Devin Nunes' Mom**
@DevinNunesMom

Follow

Running around DC jumping from Ubers doing political stunts, obstructing an investigation he was supposed to lead, leaking classified info. And what about Central Valley's water infrastructure? I don't know about you but I'm getting tired of this bullshit. #RemoveNunes #Drewfor22

 **Andrew Janz** @JanzAndrew
Nunes is compromised. Help me take this national security threat out of office. Every dollar goes to my grassroots campaign that can #removenunes
secure.actblue.com/contribute/pag…

1:08

 **Devin Nunes' Mom**
@DevinNunesMom

Follow

This is going to be disastrous for #CA22 but please understand @DevinNunes' difficult situation. Between being eyeball-deep in a federal obstruction investigation and then cradling the president's balls full time, he just doesn't have time for you anymore. Surely you understand.



**Devin Nunes' Mom** @DevinNunesMom · 24 May 2018
I wonder who's paying @DevinNunes all this money to obstruct justice?

**Washington Examiner** @dcexaminer
Devin Nunes' fundraising explodes amid aggressive defense of Trump from Russia probe washex.am/2IKfili

💬 24      🔁 128      ♡ 367      ✉



**Devin Nunes' Mom**
@DevinNunesMom

( Follow )

Replying to @FoxNews @DevinNunes @FBI

@DevinNunes your district is looking for you? Are you trying to obstruct a federal investigation again? You come home right this instant or no more Minecraft!

1:32 AM - 11 Jun 2018



**Devin Nunes' Mom**
@DevinNunesMom

( Follow )

On November 6 you have the choice between law and order or obstruction of justice. #Drewfor22 #RemoveNunes #CA22

Andrew Janz @JanzAndrew
Great spot in @RollingStone. I'm proud to be the law and order candidate in this race. rollingstone.com/politics/polit...

9:04 PM - 25 Oct 2018





In her endless barrage of tweets, Devin Nunes' Mom maliciously attacked every aspect of

Nunes' character, honesty, integrity, ethics and fitness to perform his duties as a United

States Congressman.  Devin Nunes' Mom stated that Nunes had turned out worse than

15

Jacob Wohl;[13] falsely accused Nunes of being a racist, having "white supremist friends" and distributing "disturbing inflammatory racial propaganda"; falsely accused Nunes of putting up a "Fake News MAGA" sign outside a Texas Holocaust museum; falsely stated that Nunes would probably join the "Proud Boys",[14] "if it weren't for that unfortunate 'no masturbating' rule"; disparagingly called him a "presidential fluffer and swamp rat"; falsely stated that Nunes had brought "shame" to his family; repeatedly accused Nunes of the crime of treason, compared him to Benedict Arnold, and called him a "traitor", "treasonous shitbag", a "treasonous Putin shill", working for the "Kremlin"; falsely stated that Nunes was "100% bought and sold.  He has no interest remaining for his constituents"; falsely accused Nunes of being part of the President's "taint" team;[15] falsely stated that Nunes was unfit to run the House Permanent Select Committee on Intelligence; falsely accused Nunes of "secretly hat[ing] the people he's supposed to serve"; falsely accused Nunes of being a "lying piece of shit"; falsely stated that Nunes would lose custody of his children and was going to "the pen"; falsely accused Nunes of receiving pay for undermining "American Democracy"; falsely stated that Nunes was

---

[13]     Jacob Wohl has been publicly described as an "American far-right conspiracy theorist, fraudster, and internet troll."  On February 26, 2019, Twitter permanently suspended Wohl for violating its rules regarding creating and operating fake accounts. [https://en.wikipedia.org/wiki/Jacob_Wohl].

[14]     *See*  [https://www.splcenter.org/fighting-hate/extremist-files/group/proud-boys]. The Proud Boys have been called a "white supremacists", "extremist" and a "hate group".  Devin Nunes' Mom accused Nunes of "running with those Nazi scumbags again".

[15]     The verb "taint" means to contaminate morally or to affect with putrefaction.  A "taint" is a contaminating mark or influence or a trace of a bad or undesirable substance or quality. [https://www.merriam-webster.com/dictionary/taint; https://en.oxforddictionaries.com/definition/taint].  The Urban Dictionary defines "taint" as the area of skin on a women between her vagina and her anus. [https://www.urbandictionary.com/define.php?term=taint].

"the most despicably craven GOP public official" and that "Devin might be a unscrupulous, craven, back-stabbing, charlatan and traitor, but he's no Ted Cruz"; falsely stated that Nunes was "voted 'Most Likely to Commit Treason' in high school"; falsely stated that "The people of California's Central Valley are upright folk who work hard, look you square in the eye and give you a firm handshake.   And then there is @DevinNunes"; falsely stated that Nunes is "not ALL about deceiving people. He's also about betraying his country and colluding with Russians"; stated "I don't know about Baby Hitler, but would sure-as-shit abort baby Devin"; falsely stated that "Alpha Omega wines taste like treason"; falsely stated that "@DevinNunes wanted me to tell everyone that he'll be releasing a pic soon to get ahead of that AMI thing, and that it only looks that way because of all the blow"; falsely suggested that Nunes might be willing to give the President a "blowjob"; falsely stated "@Devin Nunes look @SpeakerRyan is removing @Rep_Hunter from his committee seat because he's corrupt and incompetent. I wonder why he let you keep yours?"; falsely accused Nunes of "covering up Trump's conspiracy against the United States"; falsely accused Nunes of lying to Congress; falsely accused Nunes of suborning "perjury"; falsely stated that "@Devin Nunes is DEFINITELY a feckless cunt"; falsely stated that "[i]f you vote for @Devin Nunes the terrorists win"; falsely stated "please don't call @DevinNunes compromised. He's not at all. He's a complete and total fucking traitor"; falsely stated that Nunes was a "spy" in Congress "passing along information to the subject of a federal investigation"; falsely stated that Nunes knows "a thing or two about throwing away evidence, don't you Scabbers";[16] falsely claimed that Nunes was "WANTED" and hiding and "hopes he

---

[16]     "Scabbers" refers to Ron Weasley's pet rat in the *Harry Potter* books.

doesn't get indicted"; falsely claimed that Nunes would "probably see an indictment before 2020"; and even falsely stated that Nunes has "herp-face". Many of the tweets were vile and repulsive, including tweets that depicted Nunes engaged in sexual acts with the President:



Devin Nunes' Mom hurled repeated insults at Nunes and other members of Congress. For instance, she tweeted the following to Representative Matt Gaetz (R-FL1):



Devin Nunes' Mom falsely accused Nunes of spending money at the "Spearmint Rhino",

a strip club in Las Vegas [https://spearmintrhino.com/]:



Devin Nunes' Mom falsely accused Nunes of frequenting prostitutes and doing cocaine:



**Devin Nunes' Mom**
@DevinNunesMom

Follow

These two geniuses want to teach us all about environmental science. Never mind the fact that both of their expertise put together is worth less than a bag of dicks. When we have questions about hookers or Vegas strip clubs we'll call you, ok @DevinNunes?

> **Devin Nunes** @DevinNunes
> Thx @realDonaldTrump for bringing much needed attention to our flawed environmental policies!  Forests should be managed properly and water should be allowed for farmers to grow food to feed people. Thx for supporting the people of San Joaquin Valley and Sierra Nevada mountains! twitter.com/realDonaldTrum...

12:25 AM - 6 Aug 2018

136 Retweets   585 Likes   

She falsely professed to know "all about the hookers and coke on boats" :



**Devin Nunes' Mom**
@DevinNunesMom

Follow

Oh there's so much they don't know, sweetie. I also hope they don't know about all the hookers and coke on boats. twitter.com/enjanted/statu ...

This Tweet is unavailable.

10:36 PM - 16 Dec 2018

17 Retweets   169 Likes   

20

Devin Nunes' Mom even tweeted false and defamatory statements by Mair:



> **Devin Nunes' Mom**
> @DevinNunesMom          ( Follow )   ∨
>
> # Please don't retweet this. It's going to make @DevinNunes look really bad.
>
> ---
>
> Liz Mair 🌐 @LizMair
> Good afternoon. In your non-Kavanaugh news, our ad pointing out a slew of
> @DevinNunes failures is up on air, for the second week in a row. Watch till the end for
> the good shit, and donate to keep the ad up here: donorbox.org/swamp-accounta...
> youtube.com/watch?v=aUseOu...
>
> ---
>
> 11:54 PM · 24 Sep 2018

The sheer volume of defamatory tweets and the short time period over which they were published is staggering. In or about March 2019, after Nunes suffered substantial insult, humiliation, embarrassment, pain, mental suffering and damage to his reputation as a result of the unprecedented personal and professional attacks on his character, Twitter finally suspended Devin Nunes' Mom's account.

10.     Defendant, "Devin Nunes' cow", a person who, with Twitter's consent, created and maintains an account on Twitter (@DevinCow) for the sole purpose of attacking and defaming Nunes. [https://twitter.com/devincow?lang=en].   @DevinCow has 1,204 followers.[17]   Like Devin Nunes' Mom, Devin Nunes' cow engaged a vicious defamation campaign against Nunes that lasted over a year.   Devin Nunes' cow has made, published and republished hundreds of false and defamatory statements of and concerning Nunes, including the following:   Nunes is a "treasonous cowpoke";

---

[17]     Mair actively encouraged her Twitter followers to "go follow Devin Nunes' Cow. No, really." [https://twitter.com/LizMair/status/1017251733989453824].

"prosecutors" were "investigating Devin Nunes"; "Nunes needs to be investigated. He knew the truth, yet conspired with a criminal, @realDonaldTrump, to conceal the facts from the investigation. Nunes is a criminal too"; "718 more days until your term is up, Devin. Unless Mueller indicts you first"; "724 more days, Devin, unless the indictment comes first"; "It's on, Ranking Member Nunes. #nunesindictment"; "Devin Nunes is a traitor"; "Devin Nunes used Leadership PAC funds on luxury vacay in his family's native Portugal"; Nunes hung out with the Proud Boys at a private invite-only fundraiser; "Devin's boots are full of manure. He's udder-ly worthless and its pasture time to move him to prison"; "Devin is whey over his head in crime ... I bet @DevinNunes' cocaine yacht and underage prostitutes won Trump over #AlphaOmega!".

11.     The substance and timing of the tweets, retweets, replies and likes by Mair, Devin Nunes' Mom and Devin Nunes' cow demonstrates that all three bad actors were and are engaged in a joint effort, together and with others, to defame Nunes and interfere with his duties, employment and investigations of corruption as a United States Congressman. The purpose of the concerted defamation campaign was to cause immense pain, intimidate, interfere with and divert Nunes' attention from his investigation of corruption and Russian involvement in the 2016 Presidential Election.

12.     In addition to @LizMair, @DevinNunesMom and @DevinCow, between 2018 and the present, Twitter authorized the creation and operation of many other incendiary accounts whose sole purpose was (and is) to publish and republish (tweet and retweet) false and defamatory statements about Nunes. Among these additional Twitter accounts are "Fire Devin Nunes" (@fireDevinNunes) and "Devin Nunes' Grapes" (@DevinGrapes). The additional Twitter accounts followed the same pattern as

@DevinNunesMom and @DevinCow, and published the same false and defamatory statements Nunes was involved in underage prostitution, etc.   Fire Devin Nunes published memes of Nunes in prison attire.   In a July 30, 2018 post, Devin Nunes' cow retweeted the following:

⟲ Devin Nunes' cow Retweeted

 **Devin Nunes' Grapes**
@DevinGrapes

Man, @KimStrassel went to visit @DevinCow but not me? I'm so offended. Maybe she didn't want to be associated with the winery whose yacht hosted Devin's co-investors doing coke and getting BJs from 14 year olds.

10:21 AM · 30 Jul 18

The Twitter attacks on Nunes were pre-planned, calculated, orchestrated and undertaken by multiple individuals acting in concert, over a continuous period of time exceeding a year.   The full scope of the conspiracy, including the names of all participants and the level of involvement of donors and members of the Democratic Party, is unknown at this time and will be the subject of discovery in this action.

23

### III.  JURISDICTION AND VENUE

13.     The Circuit Court for the County of Henrico has jurisdiction of this matter pursuant to § 17.1-513 of the Virginia Code (1950), as amended.

14.     The Defendants are subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) of the Code, as well as the Due Process Clause of the United States Constitution.  The Defendants are subject to general personal jurisdiction in Virginia.  They engage in continuous and systematic business in Virginia.  They all have minimum contacts with Virginia such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

15.     Venue is proper in the Circuit Court for the County of Henrico pursuant to §§ 8.01-262(2-4) and 8.01-263(2) of the Code.

### IV.  STATEMENT OF ADDITIONAL MATERIAL FACTS

**A.**     ***Twitter, Tweets and Retweets***

16.     Twitter is a social networking and micro-blogging service that allows users to post "tweets" and to "retweet" and "like" others' posts.  "A tweet is a short text post ... delivered through Internet or phone-based text systems to the author's subscribers".  *United States v. Feng Ling Liu*, 69 F.supp.3d 374, 377 (S.D.N.Y. 2014); https://help.twitter.com/en/using-twitter/types-of-tweets (in general, a "tweet" is a "message posted to Twitter containing text, photos, a GIF, and/or video").  A "retweet" is simply a repost of another Twitter user's tweet on a user's own profile to show to that user's own followers. [https://help.twitter.com/en/using-twitter/retweet-faqs].

17.    Twitter's core product – Twitter – has over 321,000,000 active monthly users.  A total of 500,000,000 tweets are sent every single day.  126,000,000 people use Twitter every day.  There are over 69,000,000 Twitter users in the United States – over thirty-six percent (36%) of all Americans use the platform to publish and republish information.    [https://www.washingtonpost.com/technology/2019/02/07/twitter-reveals-its-daily-active-user-numbers-first-time/?utm_term=.2a744974e596; https://www.omnicoreagency.com/twitter-statistics/].

18.    Twitter generates revenues by selling advertising on its platform.  In the year ended December 31, 2017, Twitter's total revenue was $2.44 Billion Dollars.  Of that sum, $2.11 Billion Dollars consisted of revenue received from advertising.

19.    Twitter uses its platform, including proprietary algorithms, selectively to convey its corporate/institutional viewpoint, its position on issues and candidates for office, such as Plaintiff, to influence the outcome of elections, such as the 2018 election for California's 22nd Congressional District, and as a dumping ground for "oppo research".  Twitter is not a neutral platform such as an Internet bulletin board.  To the contrary: as part and parcel of its Twitter's role as an internet content provider, Twitter and its CEO, Jack Dorsey, actively endorse and promote the many agendas of the Democratic Party.

**B.**     *__Twitter's Terms of Service and Rules__*

20.    For people who live in the United States, the "Twitter User Agreement" is comprised of "Terms of Service", a "Privacy Policy", the "Twitter Rules" and all incorporated policies. https://twitter.com/en/tos.

21.     The Terms of Service ("Terms") govern a user's access to and use of Twitter's services, including its various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and other covered services ("Services"). Twitter contends that by using the Services, a user agrees to be bound by the Terms. [https://twitter.com/en/tos].

22.     Twitter recognizes that it owes a duty of reasonable care to all persons who use its platform. In order to protect the experience and safety of people who use Twitter, Twitter imposes limitations on the type of content and behavior that it allows. These limitations are set forth in the Twitter Rules. As a general rule, the Twitter Rules prohibit use of the platform for "any unlawful purposes or in furtherance of illegal activities." Unlawful purposes and illegal activities include defamation, business disparagement and insulting words. Twitter represents that it believes in

> "freedom of expression and open dialogue, but that means little as an underlying philosophy if voices are silenced because people are afraid to speak up. In order to ensure that people feel safe expressing diverse opinions and beliefs, we prohibit behavior that crosses the line into abuse, including behavior that harasses, intimidates, or uses fear to silence another user's voice."

To this end, the Twitter Rules expressly bar "abuse" and "hateful conduct":

> "Abuse:      You may not engage in the targeted harassment of someone, or incite other people to do so. We consider abusive behavior an attempt to harass, intimidate, or silence someone else's voice."
> ...

> Hateful conduct:      You may not promote violence against, threaten, or harass other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease.

> Hateful imagery and display names: You may not use hateful images or symbols in your profile image or profile header. You also may not use your username, display name, or profile bio to engage in abusive behavior, such as targeted harassment or expressing hate towards a person, group, or protected category.

26

**Impersonation**

You may not impersonate individuals, groups, or organizations in a manner that is intended to or does mislead, confuse, or deceive others. While you may maintain parody, fan, commentary, or newsfeed accounts, you may not do so if the intent of the account is to engage in spamming or abusive behavior.

[https://help.twitter.com/en/rules-and-policies/twitter-rules].   Twitter's   rationale   for

prohibiting abusive behavior is as follows:

"On Twitter, you should feel safe expressing your unique point of view.  We believe in freedom of expression and open dialogue, but that means little as an underlying philosophy if voices are silenced because people are afraid to speak up.

In order to facilitate healthy dialogue on the platform, and empower individuals to express diverse opinions and beliefs, we prohibit behavior that harasses or intimidates, or is otherwise intended to shame or degrade others."

Twitter acknowledges that:

"In addition to posing risks to people's safety, abusive behavior may also lead to physical and emotional hardship for those affected."

[https://help.twitter.com/en/rules-and-policies/abusive-behavior].[18]

23.     Twitter can suspend or terminate an account or cease providing the user

with all or part of the Services at any time for any or no reason, including, but not limited

to, if Twitter believes: (i) the user has violated the Terms or the Twitter Rules, or (ii) the

---

[18]     The rationale for Twitter's "Hateful Conduct Policy" is similar:

"Twitter's mission is to give everyone the power to create and share ideas and information, and to express their opinions and beliefs without barriers.  Free expression is a human right – we believe that everyone has a voice, and the right to use it.  Our role is to serve the public conversation, which requires representation of a diverse range of perspectives.

We recognise that if people experience abuse on Twitter, it can jeopardize their ability to express themselves."

[https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy].

user creates risk or possible legal exposure for Twitter.  Twitter reserves the right to remove content that violates the User Agreement, including for example, content that constitutes or involves "unlawful conduct" or "harassment". [https://twitter.com/en/tos].

24.     @LizMair, @DevinNunesMom, @DevinCow, @fireDevinNunes, and @DevinGrapes repeatedly tweeted and retweeted abusive and hateful content about Nunes that expressly and undoubtedly violated Twitter's Terms and Rules.

25.     Twitter provides a means to report these violations of its Terms and Rules. [https://help.twitter.com/en/rules-and-policies/twitter-report-violation; https://help.twitter.com/forms/abusiveuser].  Twitter claims it reviews and takes action on reports of abusive behavior and hateful content. https://help.twitter.com/en/rules-and-policies/enforcement-options].

26.     Twitter publicly professes to monitor its platform, as part of its effort to self-regulate content and conduct and avoid regulation by both State and Federal Governments. [*See, e.g.,* https://mashable.com/2017/11/17/twitter-hate-speech-symbols-december-18/; https://www.cnbc.com/2018/08/20/trump-says-its-very-dangerous-when-twitter-facebook-self-regulate-content-reuters.html].   Over the course of 2018, upon information and belief, Twitter's content moderators reviewed the accounts of @LizMair, @DevinNunesMom, @DevinCow, @fireDevinNunes, and @DevinGrapes, and were well aware of the defamation as it was occurring.  Upon information and belief, Twitter users also reported the abusive behavior of Mair, Devin Nunes' Mom, Devin Nunes' cow and others to Twitter.

27.     Twitter did nothing to investigate or review the defamation that appeared in plain view on its platform.  Twitter consciously allowed the defamation of Nunes to

continue.  As part of its agenda to squelch Nunes' voice, cause him extreme pain and suffering, influence the 2018 Congressional election, and distract, intimidate and interfere with Nunes' investigation into corruption and Russian involvement in the 2016 Presidential Election, **Twitter did absolutely nothing**.   Twitter permitted @DevinNunesMom, for instance, to tweet and retweet with impunity throughout 2018. Twitter only suspended the account in 2019 after Nunes' real mother, Toni Dian Nunes, complained.

28.     Twitter represents that it enforces its Terms and Rules equally and that it does not discriminate against conservatives who wish to use its "public square".  This is not true.  This is a lie.  Twitter actively censors and shadow-bans conservatives, such as Plaintiff, thereby eliminating his voice while amplifying the voices of his Democratic detractors.

## C.     _Shadow-Banning_

29.     Twitter is infamous for "shadow-banning"[19] conservatives, including Nunes. *See, e.g.*,  https://news.vice.com/en_us/article/43paqq/twitter-is-shadow-banning-prominent-republicans-like-the-rnc-chair-and-trump-jrs-spokesman;

https://www.rt.com/usa/434682-twitter-shadowbanning-conservatives/;

---

[19]     "Shadow banning" is the deliberate act of "making someone's content undiscoverable to everyone except the person who posted it, unbeknownst to the original poster."  https://blog.twitter.com/official/en_us/topics/company/2018/Setting-the-record-straight-on-shadow-banning.html].  Shadowbanned users are not told that they have been affected. They can continue to post messages, add new followers and comment on or reply to other posts.  But their messages may not appear in the feed, their replies may be suppressed and they may not show up in searches for their usernames.  The only hint that such a thing is happening would be a dip in likes, favorites or retweets—or an ally alerting them to their disappearance.  [https://www.economist.com/the-economist-explains/2018/08/01/what-is-shadowbanning].

https://www.foxnews.com/transcript/role-of-social-media-in-political-influence;

https://www.breitbart.com/politics/2018/07/27/matt-gaetz-files-fec-complaint-against-

twitter-over-shadowban/;      https://thehill.com/homenews/house/399429-nunes-suggests-

possible-legal-action-against-twitter-for-censoring;

https://dailycaller.com/2018/08/16/twitter-ban-conservatives/;

https://dailycaller.com/2018/08/05/twitter-suspends-candace-owens/.

30.     In 2018, Twitter shadow-banned Plaintiff in order to restrict his free speech and to amplify the abusive and hateful content published and republished by Mair, Devin Nunes' Mom, Devin Nunes' cow, Fire Devin Nunes, Devin Nunes Grapes, and others.  The shadow-banning was intentional.  It was calculated to interfere with and influence the federal election and interfere with Nunes' ongoing investigation as a member of the House Permanent Select Committee on Intelligence.

31.     Twitter's actions affected the election results.  The combination of the shadow-ban and Twitter's refusal to enforce its Terms and Rules in the face of clear and present abuse and hateful conduct caused Nunes to lose support amongst voters.  Twitter's actions also detracted from Nunes' investigation into corruption and Russian involvement in the 2016 Presidential Election.

32.     Twitter's use of its platform as a portal for defamation by political operatives and their clients runs contrary to every tenet of American Democracy, including the guarantees of both the First Amendment and Article I, § 12 of the Virginia Constitution.  In the words of the late United States Supreme Court Justice Oliver Wendell Holmes, Jr., "if there is any principle of the Constitution that more imperatively calls for attachment than any other, it is the principle of free thought – not free thought

for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-655 (1929) (Holmes, J., dissenting).

## COUNT I – NEGLIGENCE

33.   Plaintiff restates paragraphs 1 through 32 of his Complaint, and incorporates them herein by reference.

34.   Twitter is a "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  As the United States Supreme Court noted in *Packingham*, "on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner.  Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose.  In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." 137 S. Ct. at 1735-1736 (internal citations and quotations omitted).  The Court in *Packingham* went on to observe, in regard to social media sites like Twitter, that:

> "These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard.  They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'"

*Id*. at 1737 (citation omitted) (quoting *Reno v. American Civil Liberties Union*, 521 U. S. 844, 870 (1997)).

35.   Access to Twitter is essential for meaningful participation in modern-day American Democracy.  **A candidate without Twitter is a losing candidate**.  The ability to use Twitter is a vital part of modern citizenship.  A presence on Twitter is essential for an individual to run for office or engage in any level of political organizing in modern America.  That is because Twitter is not merely a website:  it is the modern town square.  Twitter is equivalent to the private owner of a public forum who has fully opened its

property to the general public for purposes of permitting the public's free expression and debate. That is, in fact, what Twitter has always claimed to be: its stated mission is to "[g]ive everyone the power to create and share ideas instantly, without barriers"; its self-proclaimed guiding principle is that "[w]e believe in free expression and believe every voice has the power to impact the world"; and it has referred to itself as "the live public square, the public space - a forum where conversations happen."

36.      As the private operator of a public square, Twitter owed Nunes a duty to exercise ordinary and reasonable care in the operation of its platform, so as not to cause harm to Nunes.

37.      Twitter breached its duty of reasonable care. Twitter used its platform and allowed its platform to be used by others as a means to defame Nunes. Twitter failed to take action to enforce its Terms and Rules in the face of known abusive behavior and failed to reasonably monitor and police the platform to ensure that rampant abuse and defamation was not occurring.

38.      As a direct and proximate result of Twitter's negligence, Nunes suffered actual damages in the amount of $250,000,000, including pain, insult, embarrassment, humiliation, emotional distress and mental suffering, and injury to his personal and professional reputations.

## COUNT II – DEFAMATION *PER SE*

39.      Plaintiff restates paragraphs 1 through 38 of his Complaint, and incorporates them herein by reference.

40.      The law of defamation protects a basic constitutional interest: the individual's right to personal security and the uninterrupted entitlement to enjoyment of

his reputation. *Gazette, Inc. v. Harris*, 229 Va. 1, 7, 325 S.E.2d 713 (1985) (citation omitted). In *Rosenblatt v. Baer*, Mr. Justice Stewart emphasized that:

> "'Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.' The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty ... The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored ... Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society."

383 U.S. 75, 92-93 (1966); *id. Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12 (1990) ("Good name in man and woman, dear my lord, Is the immediate jewel of their souls. Who steals my purse steals trash; 'Tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed.") (quoting WILLIAM SHAKESPEARE, OTHELLO, act 3 sc. 3)).[20]

41.     As a citizen of the United States of America *and* as a United States Congressman sworn to uphold the Constitution and laws of this great country, Nunes has a fundamental constitutional interest and entitlement to the uninterrupted enjoyment of his reputation.

42.     The First Amendment does not sanction slander or license libel. The Defendants enjoy absolutely no privilege to use Twitter as a weapon to defame.

---

[20]     Libelous speech is not protected by the First Amendment. *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 504 (1984) (cited in *Pendleton v. Newsome*, 290 Va. 162, 173, 772 S.E.2d 759 (2015)); *id. United States v. Alvarez*, 132 S. Ct. 2537, 2560 (2012) ("false factual statements possess no First Amendment value.").

43.     With the actual or apparent authority of Twitter, the Defendants, using accounts maintained on Twitter and by Twitter, made, published and republished numerous false factual statements, which are detailed verbatim above, about or concerning Nunes without privilege of any kind.

44.     The false statements constitute defamation *per se*.  The statements accuse and impute to Nunes the commission of crimes involving moral turpitude and for which Nunes may be punished and imprisoned in a state or federal institution.  The statements impute that Nunes is infected with some contagious disease, where if the charge were true (and it is not), it would exclude Nunes from society.  The statements impute to Nunes an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment.  Finally, Defendants' false statements also prejudice Nunes in his profession or trade as a United States Congressman.

45.     Defendants' false statements have harmed Nunes and his reputation.

46.     Nunes honorably serves as a United States Congressman.  Defendants' false statements that Nunes is a "spy", that he works for the "Kremlin", that he is a "treasonous Putin shill" are especially egregious and insulting, considering that Nunes has sworn a solemn oath to uphold the Constitution and Laws of the United States of America and has dutifully discharged his duty to this Country for over a decade.  The baseless accusation of a connection between Nunes and Russia impugns the honor, integrity and ethics of a United States Congressman and illustrates the desperate and cowardly attempt to manufacture evidence of "collusion" where none exists.

34

47.     Defendants made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

a.     Defendants intentionally employed a scheme or artifice to defame Nunes with the intent to cause him to lose the 2018 Congressional election. Defendants, in whole or in part, acted in concert with clients to accomplish an unlawful purpose through unlawful means, without regard for the Nunes' rights and interests.

b.     Defendants knew that Nunes had and has not committed any crimes and did not engage in the unlawful and salacious behavior described in the tweets. There is no evidence in the public record to suggest that Nunes was (or is) the subject of any criminal complaint or criminal investigation, and there are certainly no indictments, arrests or convictions of any kind. Defendants' statements are total fabrications.

c.     Defendants chose to manufacture and publish false and scandalous statements and use insulting words that were unnecessarily strong and that constitute violent, abusive and hateful language, disproportionate to the occasion, in order to undermine public confidence in Nunes and affect the election. The words chosen by the Defendants evince their ill-will, spite and actual malice.

d.     Defendants did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Nunes.

e.     Defendants reiterated, repeated and continued to republish false defamatory statements out of a desire to hurt Nunes and to permanently stigmatize him.

35

48.     As a direct result of Defendants' defamation, Nunes suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, special damages, costs, and other out-of-pocket expenses, in the sum of $250,000,000 or such greater amount as is determined by the Jury.

## COUNT III – INSULTING WORDS

49.     Plaintiff restates paragraphs 1 through 48 of his Complaint, and incorporates them herein by reference.

50.     Defendants' insulting words, in the context and under the circumstances in which they were written and tweeted, tend to violence and breach of the peace.  Like any reasonable person, Nunes was humiliated, disgusted, angered and provoked by the Defendants' insulting words.

51.     Defendants' words are fighting words, which are actionable under § 8.01-45 of the Virginia Code (1950), as amended.

52.     As a direct result of Defendants' insulting words, Nunes suffered actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, special damages, costs, and other out-of-pocket expenses, in the sum of $250,000,000 or such greater amount as is determined by the Jury.

## COUNT IV – COMMON LAW CONSPIRACY

53.     Plaintiff restates paragraphs 1 through 52 of his Complaint, and incorporates them herein by reference.

54.     Beginning in February 2018 and continuing through the present, Mair, Devin Nunes' Mom and Devin Nunes' cow, acting as individuals, combined, associated, agreed or acted in concert with each other and/or with one or more "clients" or other donors, non-profits, operatives or agents of the Democratic Party (whose identity is unknown at this time) for the express purposes of injuring Nunes, intentionally and unlawfully interfering with his business and employment as a United States Congressman, and defaming Nunes.  In furtherance of the conspiracy and preconceived plan, the Defendants engaged in a joint scheme the unlawful purpose of which was to destroy Nunes' personal and professional reputations and influence the outcome of a federal election.

55.     The Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming Nunes.  As evidenced by their concerted action on Twitter, the Defendants acted with the express and malicious intent to cause Nunes permanent injury.

56.     The Defendants' actions constitute a conspiracy at common law.

57.     As a direct result of the Defendants' willful misconduct, Nunes suffered actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, special damages, costs, and other out-of-pocket expenses, in the sum of $250,000,000 or such greater amount as is determined by the Jury.

## COUNT V – INJUNCTION

58.     Plaintiff restates paragraphs 1 through 57 of his Complaint, and incorporates them herein by reference.

59.     In order to protect Nunes's property interests and his reputation, Nunes requests the Court (a) to Order Twitter to reveal the names and contact information of the persons behind the accounts "Devin Nunes' Mom", "Devin Nunes' cow", "Fire Devin Nunes" and "Devin Nunes Grapes", and (b) to permanently enjoin and order Twitter to suspend @LizMair, @DevinNunesMom and @DevinCow and to deactivate all hyperlinks to all tweets, retweets, replies and likes by @LizMair, @DevinNunesMom and @DevinCow that contain false and defamatory statements about Nunes.

60.     The identity of those behind these Twitter accounts is a matter of great public concern.   Whether the accounts are controlled by wealthy Democrats, the Democratic National Committee, an opposition research firm, such as Fusion GPS [http://www.fusiongps.com/], the "Russians", the "Chinese", or some other foreign government or non-governmental organization (NGO), the corruption of American Democracy and society by intentional falsehoods, fraud and defamation must stop.

61.     Nunes has no adequate remedy at law.  Without Court intervention and an injunction, Nunes will suffer actual and irreparable injury to his property interests and personal rights by the mere fact that Defendants' defamatory tweets can be retweeted and republished forever by third-parties.

62.     There is a substantial likelihood that Nunes will succeed on the merits of his claims.

Nunes alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.   Nunes believes that substantial additional evidentiary support, which is in the exclusive possession of Twitter, Mair, Mair Strategies, Devin Nunes Mom, Devin Nunes' cow and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Nunes reserves his right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Devin G. Nunes respectfully requests the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.      Compensatory damages in the amount of $250,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest from March 18, 2018 until the date Judgment is entered at the maximum rate allowed by law;

D.      Postjudgment interest at the rate of six percent (6%) per annum until paid;

E.      Attorney's Fees and Costs;

F.      Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:     March 18, 2019


DEVIN G. NUNES


By:   */s/ Steven S. Biss*
      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:     (804) 501-8272
      Facsimile:     (202) 318-4098
      Email:     **stevenbiss@earthlink.net**

*Counsel for Plaintiff, Devin G. Nunes*

40

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAWN MUSGRAVE             *
185 Forest Avenue              *
Unit 4A                        *
Palo Alto, CA  94301,         *
                              *
     Plaintiff,              *
                              *
     v.                     *        Civil Action No. 1:21-cv-00554
                              *
DEPARTMENT OF JUSTICE    *
950 Pennsylvania Avenue, NW   *
Washington, DC  20530,      *
                              *
     Defendant.           *
                              *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff Shawn Musgrave brings this action against Defendant Department of Justice pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, *as amended* ("FOIA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.

## JURISDICTION

1.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2.      Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Shawn Musgrave ("Musgrave") is a citizen of the United States and a resident of the State of California. As a freelance reporter whose work has been featured in

*Politico*, the *Boston Globe*, the *Intercept*, and elsewhere, Musgrave is a representative of the news media within the meaning of 5 U.S.C. § 552(a)(4)(A).

4.      Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552(e) and is in possession and/or control of the records requested by Musgrave which are the subject of this action.

5.      The Federal Bureau of Investigation ("FBI") and Office of Information Policy ("OIP") are DOJ components.

## BACKGROUND

6.      In 2017, an unknown individual created the anonymous parody Twitter account @DevinCow, which fictitiously purports to be the account of a cow owned by U.S. Representative Devin Nunes ("Cong. Nunes").

7.      In March 2019, Cong. Nunes drew significant public attention to the account by suing Twitter, the anonymous owner of the @DevinCow account, and several other parties for defamation, claiming $250 million in damages in a complaint filed in Virginia. In the complaint, Cong. Nunes quoted @DevinCow's tweets—calling Cong. Nunes, for example, a "treasonous cowpoke"—as support for his allegation that there was a coordinated online defamation campaign against him.

8.      After Cong. Nunes filed his lawsuit, the @DevinCow account gained over 750,000 new Twitter followers and was the subject of widespread press coverage, which ranged from discussion of the merits of the lawsuit itself to speculation regarding the identity of the account's owner.

9.      Since filing his Virginia lawsuit, Cong. Nunes and his legal team have tried in several different ways to "unmask" the anonymous Twitter user behind @DevinCow. First, in

addition to monitoring the account itself for possible clues, they have tried multiple times in the

Virginia case to subpoena Twitter for identifying information about the account. That effort has

thus far failed. *See* Kate Irby, *Devin Nunes' Attorney Says He's at 'Dead End' in Quest to Reveal*

*Identity of Twitter Cow*, Fresno Bee, June 12, 2020, *available at*

https://www.fresnobee.com/news/politics-government/article243488476.html.

      10.    Cong. Nunes's lawyer Steven Biss further attempted to subpoena Twitter for

identifying information on @DevinCow in a completely unrelated case in which Biss

represented a different client. Twitter's lawyers responded to that request by calling the attempt

"not merely defective and unlawful," but also apparently "made for an improper purpose: to end-

run around discovery disputes in an unrelated lawsuit." This effort also failed. *See* Jerry Lambe,

*Twitter Demands Attorney's Fees From Nunes' Lawyer for Trying to Unmask @DevinCow*

*Through Unrelated Lawsuit*, Law & Crime, Feb. 7, 2020, *at* https://lawandcrime.com/high-

profile/twitter-demands-attorneys-fees-from-nunes-lawyer-for-trying-to-unmask-devincow-

through-unrelated-lawsuit/.

      11.    Cong. Nunes was the Chair of the House Permanent Select Committee on

Intelligence from 2015-2019 and is currently the Committee's Ranking Member.

      12.    As a result of the repeated efforts by Cong. Nunes and his legal team to unmask

@DevinCow—of which the above instances are merely examples—Musgrave filed two FOIA

requests—with the permission of @DevinCow's owner—to ascertain the degree to which FBI

and DOJ—with or without Cong. Nunes's involvement—have attempted to identify the

anonymous owner of the @DevinCow Twitter account.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (FBI -- RECORDS DENIAL – 1480963-000)

13.     Musgrave repeats and realleges the allegations contained in all paragraphs set forth above.

14.     On 9 November 2020, Musgrave submitted to FBI a request for five categories of records: (1) all main file records about the @DevinCow Twitter account; (2) all cross-references in the Central Records System about the @DevinCow Twitter account; (3) all internal emails or other correspondence records created or maintained by the Office of Congressional Affairs mentioning the @DevinCow Twitter account; (4) all emails in the FBI email system(s) or personal email folders on personal computers used by the Washington Field Office and San Francisco Field Office mentioning the @DevinCow Twitter account; and (5) all emails in the FBI email system(s) or personal email folders on personal computers used by the Criminal, Cyber, Response, and Services Branch mentioning the @DevinCow Twitter account.

15.     Musgrave added, "Please note that we do not wish to know the identity of the owner of the @DevinCow account, so the FBI should automatically redact any personally identifying information about that individual while releasing the contextual information which would show that PII was redacted. We are only interested in records discussing the account and/or the possible identification of its owner, not in the identity itself."

16.     On 17 November 2020, FBI acknowledged receipt of this request and assigned it Request No. 1480963-000. FBI stated that it could neither confirm nor deny the existence of any responsive records—known as a "*Glomar* response"—because of the privacy interests of third party individuals.

4

17.    On 23 November 2020, Musgrave appealed this decision to OIP. Musgrave stated, "It is nonsensical to issue a (b)(6) *Glomar* response to a request for records about an anonymous Twitter account, especially when the request has formally indicated that we have no interest in learning the identity of the user."

18.    That same day, OIP acknowledged receipt of this appeal and assigned it Appeal No. A-2021-00372.

19.    On 1 February 2021, OIP affirmed FBI's determination.

20.    Musgrave has a legal right under FOIA to obtain the information he seeks, and there is no legal basis for the denial by FBI and DOJ of said right.

## SECOND CAUSE OF ACTION

### (OIP – CONSTRUCTIVE RECORDS DENIAL – FOIA-2021-00272)

21.    Musgrave repeats and realleges the allegations contained in all paragraphs set forth above.

22.    On 9 November 2020, Musgrave submitted to OIP a request for three categories of records: (1) all emails or other correspondence records created or maintained by the Office of Congressional Affairs mentioning the @DevinCow Twitter account; (2) all emails or other correspondence records created or maintained by the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General mentioning the @DevinCow Twitter account; and (3) all other records or information about the @DevinCow Twitter account in the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General, and the Office of Legislative Affairs.

23.    Musgrave added, "Please note that we do not wish to know the identity of the owner of the @DevinCow account, so DOJ should automatically redact any personally

5

identifying information about that individual while releasing the contextual information which would show that PII was redacted. We are only interested in records discussing the account and/or the possible identification of its owner, not in the identity itself."

24. On 18 November 2020, OIP acknowledged receipt of this request and assigned it Request No. FOIA-2021-00272.

25. As more than thirty working days have elapsed without a substantive decision, Musgrave has exhausted all required administrative remedies.

26. Musgrave has a legal right under FOIA to obtain the information he seeks, and there is no legal basis for the denial by DOJ of said right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shawn Musgrave prays that this Court:

(1) Order the Federal Bureau of Investigation and Office of Information Policy to release all requested records to him at no charge;

(2) Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(3) Award reasonable costs and attorneys' fees as provided in 5 U.S.C. § 552(a)(4)(E), 28 U.S.C. § 2412(d), or any other applicable law;

(4) Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(5) Grant such other relief as the Court may deem just and proper.

Date:   March 3, 2021

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

7

# EXHIBIT E

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF HENRICO

DEVIN G. NUNES            )
                                )
        Plaintiff,         )
                                )
v.                           )        Case No. CL19-1715
                                )
                                )
TWITTER, INC.           )
      et al               )
                                )
        Defendants.     )
                                )

# PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT, TWITTER

Plaintiff, Devin G. Nunes, by counsel, pursuant to Rules 4:1, 4:8 and 4:9 of the Rules of the Supreme Court of Virginia (the "Rules"), hereby requests that Defendant, Twitter, Inc., answer the following interrogatories, separately, in writing and under oath, and produce the following documents for inspection and copying at the law office of Steven S. Biss, Esquire, 300 West Main Street, Suite 102, Charlottesville, Virginia 22903, within the time prescribed by the Rules:

Continued on Next Page

1

## DEFINITIONS AND INSTRUCTIONS

1.      The term "document" shall mean and include all written, electronic, digital and graphic matter of every kind and description, whether written or produced or transmitted by computer, typewriter, printer, photocopier or other machine or by hand, whether in printed form or on computer disk, and whether in the actual or constructive possession, custody or control of you, including, without limitation, any and all files, records, disks, emails, text messages, instant messages, direct messages. iMessages, letters, correspondence, memoranda, notes, statements, transcripts, workpapers, sound recordings, cds, dvds, videotapes, charts, reports, books, ledgers, registers, books of account, account statements, financial statements, checks, check stubs, deposit receipts, and any other written, electronic or graphic record of any kind, whether or not such documents are claimed to be privileged from discovery on any ground.

2.      "You" and "your" shall mean the person or entity to whom/which this request or subpoena is directed, including his, her, their or its agents, representatives, employees, attorneys, experts, investigators, insurers or anyone acting on behalf of the foregoing.

3.      "Person" or "person" means any individual, sole proprietorship, partnership (general or limited), limited liability company, limited liability partnership, corporation, association, trust or other entity.

4.      "Plaintiff" means Plaintiff, Devin G. Nunes, including, without limitation, any agent, representative or employee of Plaintiff.

5.      "Twitter" means defendant, Twitter, Inc., including, without limitation, any officer, director, manager, agent, representative or employee of Twitter.

6.      "Devin Nunes' Mom" means the creator, owner, holder, sponsor, user, or operator, including, without limitation, all officers, directors, managers, members, shareholders, parents, subsidiaries, partners, agents, representations, employees, associates and/or affiliates of such persons or entities, of the following Twitter account:



7.      "Devin Nunes' cow" means the creator, owner, holder, sponsor, user, or operator, including, without limitation, all officers, directors, managers, members, shareholders. Parents, subsidiaries, partners, agents, representations, employees, associates and/or affiliates of such persons or entities, of the following Twitter account:



8.      "Relating to" means to refer to, reflect, pertain to, or in any manner be connected with the matter discussed.

9.      "Identify" or "identification", when used in reference to a person, means to state their full name, their present or last known home and business addressees) and their present or last known home and business telephone number(s).  "Identify" or "identification", when used in reference to a document, means to state or specify the type of document, e.g. letter, memoranda, etc., its date, its author, signer, addressee, its contents, and any other information necessary to identify the document for purposes of an interrogatory, request for production of documents or subpoena duces tecum.  As an alternative to identifying the document, a copy may be attached to your answer.  If any such document was but is no longer in your possession or subject to your control, state what happened to the document.  "Identify" or "identification", when used in reference to a communication, representation or discussion, means to state the person(s) to whom such communication was made, the medium of communication, *e.g.,* letter, telephone, fax, email, etc., the date of such communication, and the subject matter and substance of such communication.

10.     "Describe" means state what is requested to be described, including all facts and opinions known and held regarding what is requested to be described, and (I) the identity of each person involved or having knowledge of each fact or opinion relating to what is described, (II) the identity of each document evidencing the answer given or relating to what is disclosed in the answer given, and (III) all relevant or material dates or time periods.

11.     If you consider any document called for by a request for production of documents to be privileged from discovery, include in your answer/response a list of the documents withheld, identifying each document by date, author, addressee, all recipients, all persons who have seen the document, the title and a brief description of the subject matter which will allow for a determination whether the document is privileged.  Finally, you should state the grounds upon which each document is claimed to be privileged.

12.     The definitions used in Plaintiff's Complaint are restated and incorporated herein by reference.

Continued on Next Page

## INTERROGATORIES

Plaintiff propounds the following interrogatories upon Twitter to be answered separately, in writing and under oath:

1.      Identify the name, address and telephone number of each person likely to have discoverable information that Twitter may use to support any denial of the factual allegations and/or any defenses to the claims in Plaintiff's Complaint, and, for EACH and EVERY such person, describe in detail ALL information known or believed to be known by such person.

**THERE WILL BE AN OBJECTION RAISED TO ANY PERSON CALLED TO TESTIFY OR ANY FACT NOT DISCLOSED IN RESPONSE TO THIS INTERROGATORY.**

**ANSWER**:


2.      In accordance with Rule 4:1(b)(4)(A)(i) of the Rules, identify each person who Twitter expects to call as an expert witness at trial or at any hearing in this action, and, for EACH such person, state the subject matter on which the witness is expected to testify, and state the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each opinion.

**THERE WILL BE AN OBJECTION RAISED TO ANY PERSON CALLED TO TESTIFY OR ANY FACT NOT DISCLOSED IN RESPONSE TO THIS INTERROGATORY.**

**ANSWER**:

3.      Identify all users of Twitter who reside or work in Virginia.

**ANSWER**:


4.      Identify all persons (including individuals, sole proprietorships, associations, trusts, partnerships, limited liability companies, and corporations) whose homes or offices are located in Virginia, and with whom Twitter conducted any business activity between March 18, 2014 and March 18, 2019.

**ANSWER**:


5.      For each person identified in the preceding interrogatory, describe in detail the business activity conducted by Twitter with such person between March 18, 2014 and March 18, 2019, including, without limitation, all revenue and/or income generated or derived by Twitter from such person(s), and PRODUCE all tax returns, financial statements, ledgers or other records that evidence such revenue and income.

**ANSWER**:


6.      Identify the number of times Twitter (including, without limitation, its officers, directors, agents, representatives and/or employees) has been physically present in Virginia on business between March 18, 2014 and March 18, 2019, and describe in detail the purpose and nature of such business and the duration of the visit(s).

**ANSWER**:

7.      Identify all advertising by Twitter that is undertaken with agencies located in Virginia or that is targeted to persons who live or work in Virginia or that is embedded in the homepage or timeline of any Twitter user that lives or works in Virginia.

**ANSWER**:


8.      Identify all property located in Virginia, both real and personal (including, without limitation, (a) deeds, deeds of trust, leases, contracts, agreements, notes, instruments, security, furniture, fixtures, equipment, inventory, intellectual property, choses in action, or receivables performed or performable in Virginia, (b) bank or brokerage accounts located in Virginia, or (c) shares, membership interests, units, or other legal or beneficial interests in associations, trusts, partnerships, limited liability companies, and/or corporations formed under Virginia law) in which Twitter had any title or legal, equitable or beneficial interest between March 14, 2016 and March 18, 2019.

**ANSWER**:


9.      Identify and/or PRODUCE copies of records of all telephone calls made by any agent or employee of Twitter (from any land line, cell phone, computer, iPad, Blackberry or other electronic device) to any person known or believed to be located in Virginia or to area codes 276, 434, 540, 571, 703, 757 and/or 804 between March 18, 2014 and March 18, 2019 relating to any business, either actual (ongoing or completed) or prospective.

**ANSWER**:

8

## REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff requests Twitter to produce complete and genuine copies of the following:

**UNLESS OTHERWISE NOTED, THE FOLLOWING REQUEST FOR PRODUCTION OF DOCUMENTS SEEKS DOCUMENTS AND ELECTRONICALLY STORED INFORMATION DATED OR FOR THE TIME PERIOD FROM <u>MARCH 18, 2014 AND MARCH 18, 2019</u> (THE "RELEVANT PERIOD")**

**IF TWITTER HAS NO DOCUMENTS RESPONSIVE TO THE FOLLOWING REQUESTS, THE ANSWER SHOULD CLEARLY STATE "NONE" OR "NO DOCUMENTS".**

1.      All documents requested to be produced in and by the above Interrogatories.

2.      Financial statements, balance sheets, and income and expense statements for the years 2014, 2015, 2016, 2017 and 2018 (year-to-date) that evidence or reflect income received from business transacted in Virginia.

3.      Federal or State income tax returns for the years 2014, 2015, 2016, 2017 and 2018, including all W2s, 1099s, notes, statements, and accompanying workpapers, that evidence or reflect income received from business transacted in Virginia.

4.      Account statements, monthly, quarterly and year-end, for any account in the name of Twitter, or controlled or beneficially owned by Twitter at any federal lending institution, bank, credit union, and/or brokerage located in Virginia.

5.      Contracts or agreements between Twitter and any person or business (including individuals, sole proprietorships, associations, trusts, partnerships, limited liability companies, and corporations) performed or performable in Virginia.

6.      Deeds, deeds of trust, mortgages, leases, licenses, bills of sale, purchase orders, bills of lading, titles, security agreements, tax bills, certificate of incorporation, certificate of organization, certificate of partnership, by-laws, operating agreements, trust agreements, and other documents that constitute, evidence, demonstrate or show any interest, legal, equitable or beneficial, by Twitter in any real or personal property located in Virginia.

7.      All documents that evidence, demonstrate, show or reflect the conduct or transaction of any business in Henrico County, Virginia, by Twitter, including, without limitation, copies of complaints and other papers served on Twitter's registered agent in Henrico County.

8.      All internal email communications and text messages by and between officers, directors, agents, or employees of Twitter that mention Plaintiff or that are of and concerning Plaintiff.

9.      All account creation or account opening documents and information relating to Twitter account @DevinNunesMom, including, without limitation, username registrations, phone numbers, associated phone numbers, emails, email verification requests, email verifications, SMS text messages, text message verifications, transcripts of voice calls, and/or passwords or login verifications, that were submitted or transmitted to Twitter by any person and all updates of such information submitted or transmitted to Twitter after the creation of @DevinNunesMom.

10.     Copies of all tweets, retweets, replies, likes, postings, messages or written content of any kind or nature posted by @DevinNunesMom that mention Plaintiff or that are of and concerning Plaintiff.

11.     All account creation or account opening documents and information relating to Twitter account @DevinCow, including, without limitation, username registrations, phone numbers, associated phone numbers, emails, email verification requests, email verifications, SMS text messages, text message verifications, transcripts of voice calls, and/or passwords or login verifications, that were submitted or transmitted

to Twitter by any person and all updates of such information submitted or transmitted to Twitter after the creation of @DevinCow.

12.    Copies of all tweets, retweets, replies, likes, postings, messages or written content of any kind or nature posted by @DevinCow that mention Plaintiff or that are of and concerning Plaintiff.

13.    A copy of any insurance agreement or policy under which an insurance business may be liable to satisfy all or part of a possible judgment against Twitter in this action or to indemnify or reimburse for payments made to satisfy the judgment.


**THESE REQUESTS ARE CONTINUING IN NATURE AS PROVIDED FOR IN THE RULES.**

**PLAINTIFF HEREBY REQUESTS THAT TWITTER SUPPLEMENT ITS DISCOVERY RESPONSES IMMEDIATELY UPON RECEIPT OF ADDITIONAL DOCUMENTS AND INFORMATION.**


DATED:      June 24, 2019


Signature of Counsel on Next Page

DEVIN G. NUNES

By: _____
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:    (804) 501-8272
Facsimile:    (202) 318-4098
Email:        **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2019 a copy of the foregoing was served

electronically in PDF and by regular mail upon counsel for the Defendants.

By: _____
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:    (804) 501-8272
Facsimile:    (202) 318-4098
Email:        **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*

13

# EXHIBIT F

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF HENRICO

DEVIN G. NUNES                        )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )          Case No. CL19-1715-00
                                      )
                                      )
TWITTER, INC., *et al.*,              )
                                      )
          Defendants.                 )

## ORDER ON TWITTER'S MOTION TO DISMISS

On June 12, 2020, the parties, by counsel, upon proper notice, appeared before the Court on Defendant Twitter, Inc.'s ("Twitter") motion to dismiss based on preemption and immunity under 47 U.S.C. § 230, which was filed on January 22, 2020. The Court has considered the pleadings and briefing filed by the parties, including the memoranda in support of Twitter's motion, the memorandum in opposition filed by Plaintiff Devin G. Nunes ("Nunes"), the supplemental authority filed by Nunes, and Twitter's response to the supplemental authority, as well as the legal authorities cited by the parties in the memoranda. The Court also considered the argument presented by counsel at the hearing.

For the reasons stated in the Court's Letter Opinion dated June 24, 2020, which is hereby incorporated herein by reference, it is ORDERED that Twitter's motion to dismiss is GRANTED. The Court finds that 47 U.S.C. § 230 provides Twitter with immunity from civil liability in this action. Accordingly, all claims alleged against Twitter in this action are dismissed with prejudice.

The Clerk is directed to send a copy of this Order to all counsel of record upon entry.

IT IS SO ORDERED.

ENTERED: 7 / 24 / 2020

_____

The Honorable John Marshall, Judge

WE ASK FOR THIS:

_____

Charles K. Seyfarth (VSB No. 44530)
Elizabeth Scott Turner (VSB No. 88056)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 403-7137
Facsimile:  (804) 237-0250
cseyfarth@ohaganmeyer.com
eturner@ohaganmeyer.com

Patrick J. Carome (admitted *pro hac vice*)
Ari Holtzblatt (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE & DORR, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile:  (202) 663-6363
patrick.carome@wilmerhale.com
ari.holtzblatt@wilmerhale.com

*Counsel for Defendant Twitter, Inc.*

SEEN AND _____:

_____   Signature blocked
Steven S. Biss (VSB No. 32972)                1-13
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile:  (202) 318-4098
stevenbiss@earthlink.net

*Counsel for Plaintiff Devin G. Nunes*

3

**RECEIVED**

JUL 0 9 2020

HENRICO COUNTY CIRCUIT COURT
JUDGES CHAMBERS

**RECEIVED**

JUL 24 2020

CLERK'S OFFICE
HENRICO CIRCUIT COURT

Scanned 7/30/2020
Copies sent to:
Counsel for Plt.
"      " Def.
LCL

# EXHIBIT G

**From:** ████████████
**To:** Schottlaender, Hayden (DAL)
**Subject:** RE: Subpoena to Twitter
**Date:** Wednesday, January 27, 2021 9:44:13 AM

I have consulted with my supervisor here at the US Attorney's Office, and we will not agree to provide any further information at this time.  Thanks, and feel free to reach out with any further questions or information. -- ████

---

**From:** Schottlaender, Hayden (Perkins Coie) <HSchottlaender@perkinscoie.com>
**Sent:** Wednesday, January 27, 2021 10:20 AM
**To:** ████████████████████████
**Subject:** Re: Subpoena to Twitter

Thank you ██████. Would you be able to either share the threatening communications at issue or tell me if those threats were directed at Devin Nunes?

Hayden

**Hayden M. Schottlaender | Perkins Coie LLP**
**ASSOCIATE**
500 N. Akard Street, Suite 3300
Dallas, Texas 75201
D. +1.214.965.7724
F. +1.214.965.7774
E. HSchottlaender@perkinscoie.com


On Jan 27, 2021, at 8:39 AM, ████████████████████
████████████████████ wrote:


Good morning — Thanks for speaking yesterday.  The grand jury subpoena was issued as part of a criminal investigation into potential violations of 18 U.S.C. Section 875(c) (threatening communications in interstate commerce).  Does this information resolve any issues, or would you like to speak further?  Thanks. —████████████████████
████

---

**From:** Schottlaender, Hayden (Perkins Coie) <HSchottlaender@perkinscoie.com>
**Sent:** Tuesday, January 26, 2021 2:03 PM
**To:** ████████████████████████
**Subject:** RE: Subpoena to Twitter

Docs attached. Just sent a calendar invite for 4:30.

Thank you,

Hayden

**Hayden Schottlaender** | **Perkins Coie LLP**
ASSOCIATE
500 N. Akard Street Suite 3300
Dallas, TX 75201
D. +1.214.965.7724
F. +1.214.965.7774
E. HSchottlaender@perkinscoie.com

---

**From:** ████████████████████████████████████████
**Sent:** Tuesday, January 26, 2021 12:40 PM
**To:** Schottlaender, Hayden (DAL) <HSchottlaender@perkinscoie.com>
**Subject:** Re: Subpoena to Twitter

Thanks, how about 4:30 pm et today?  And could you forward the subpoena and NDO that we will be discussing? — ████████████████████████

On Jan 25, 2021, at 7:59 PM, Schottlaender, Hayden (Perkins Coie) <HSchottlaender@perkinscoie.com> wrote:

> Hi ████████:
>
> Apologies for intruding tonight, I'm sure you're quite busy. As I mentioned, I represent Twitter. I'm calling in regards to a grand jury subpoena you served on them, #GJ2020111968168. I have a few questions for you about that subpoena and the accompanying NDO. If you could spare me 10 minutes of your time to discuss Twitter's concerns, I'd greatly appreciate it.
>
> I am largely free this week so just let me know some days and times that work best for you.
>
> Hayden
>
> **Hayden Schottlaender** | **Perkins Coie LLP**
> ASSOCIATE
> 500 N. Akard Street Suite 3300
> Dallas, TX 75201
> D. +1.214.965.7724
> F. +1.214.965.7774
> E. HSchottlaender@perkinscoie.com
>
> ---
>
> NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.